# UNITED STATES DISTRICT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | Case No. 21-cr-398 (BAH)-1 |
| | **)** | |
| **JAMES BURTON MCGREW,** | **)** | |
| | **)** | |
| Defendant. | **)** | |

## MOTION FOR RECONSIDERATION OF DETENTION ORDER

John M. Pierce
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
Tel: (213) 400-0725
Email: jpierce@piercebainbridge.com

Attorney for Defendant James Burton McGrew

Defendant JAMES McGREW, by and through his counsel or record, respectfully moves this Honorable Court to reconsider the Detention Order entered by the United States Magistrate Judge John Z. Boyle in the District of Arizona on June 4, 2021.

Mr. McGREW's counsel has worked with his family and friends to conduct an investigation regarding his suitability for pretrial release.  Based on that investigation Counsel believes there now exists "a condition or combination of conditions that will reasonably assure the appearance of the defendant as requested" and "will reasonably assure the safety of any other person and the community" following the defendant's release.

I.   **PROCEDURAL BACKGROUND**

On May 28, 2021, Mr. McGREW was arrested at a residence belonging to his sister in Glendale, Arizona where he was staying temporarily.  ECF Doc. No. 5. A criminal complaint and arrest warrant had been issued by this Court on May 27, 2021, supported by an Affidavit executed by FBI Task Force Officer (TFO) Jordan Good on May 26, 2021.

Mr. McGrew made an initial appearance in the District of Arizona on June 1, 2021 before Magistrate Judge Boyle, at which time counsel was appointed for him.

A detention hearing was scheduled for June 4, 2021, and at that hearing Mr. McGREW was ordered detained pursuant to 18 U.S.C. § 3142(f)(2), both as a "flight risk" and a "danger to the community," and was ordered to be transported to

1

the District of Columbia by the United States Marshal's Service.  Rule 5

Proceedings, ECF Doc. No. 8, Case No. 21-mj-08121 JZB, District of Arizona.

On June 25, 2021, Mr. McGREW made his first appearance in this Court,

entering a plea of "not guilty" to the charges in an indictment that had been

returned by a Grand Jury in this District on June 15, 2021.

Mr. McGREW is charged with felony offenses alleging that he "corruptly

obstructed an official proceeding," that he committed "civil disorder," for "assaulting

a law enforcement officer," and that he entered or remained in a "restricted building

with a dangerous weapon" during the events of January 6.  Mr. McGREW is also

charged with three Class B misdemeanors.

No Judge of this Court has reviewed the Detention Order made by

Magistrate Judge Boyle, or the factual basis upon which Mr. McGREW was

detained as a "flight risk" and "danger" in the District of Arizona.  Neither Pretrial

Services in this District nor this Court have reviewed or rejected the conditions of

pretrial release proposed by this motion that would mitigate any such "danger" or

"flight risk" based on the factual record made before Magistrate Judge Boyle.

The record evidence before Magistrate Judge Boyle was the Affidavit of

TFO Good, as well as the oral proffer made by the government at the time of the

detention hearing.  Factual inaccuracies now apparent TFO Good's Affidavit, and

evidence/information developed by Mr. McGREW's current counsel of record have

never been considered.

James DeGREW is a 39-year-old citizen of the United States who is a combat veteran of the Iraq War, having enlisted in the United States Marine Corps in 2003 at the age of 21.  He was deployed to Iraq at the height of fighting in the city of Fallujah as an "Infantry Assaultman" and "Machine Gunner".

In July 2005 the while manning a mounted machinegun, the Humvee he was traveling in was blown-up by an IED.  As a result of having been blown 30 feet into the air by the force of the explosion, Mr. McGrew suffered a concussion, permanent damage/impairment to his hearing, and soft-tissue injuries to his legs and back. But given the circumstances of the fighting at that moment in time, Mr. McGREW did not leave his unit, and was back patrolling with his squad in Fallujah within 72 hours.

After returning from Iraq Mr. McGREW underwent treatment for complications from his injuries, and eventually received a Medical Discharge with Honor in January 2007.  Mr. McGREW has undergone medical treatment within the VA system for more than a decade, including being hospitalized for three weeks in April and May 2021 with near total kidney failure.  Mr. McGREW is continuing to experience medical problems that are potentially related to the conditions that led to his hospitalization, and his complaints and requests to see medical staff have been largely ignored by the District of Columbia Department of Corrections and the District of Columbia Jail staff.

## II.   **LEGAL STANDARD**

Under the Bail Reform Act, "a person [] ordered detained by a magistrate judge . . . may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The authority to review a release order lies with the District Court. *United States v. Hassanshahi*, 989 F. Supp. 2d 110, 113 (D.D.C. 2013).

To determine if pretrial detention is appropriate, courts consider four statutory factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Munchel*, 991 F.3d 1273, 1279-80 (D.C.Cir. 2021). But, as the Circuit Court cautioned in that case:

> A defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."

*Id.*

The *Munchel* Court went on to quote the Supreme Court in *United States v. Salerno*, 481 U.S. 739, 751 (1987) as follows: "[W]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, ... a court may disable the arrestee from executing that threat."

The task for this Court is to consider whether, on the record made by the Government previously, there is sufficient evidence of a "concrete, prospective

threat to the community" if Mr. McGREW were to be released, AND that the nature of the threat is such that it cannot be mitigated by terms and conditions of pretrial release that are now being offered to this Court for the first time.

This Court set forth certain specific factors in *United States v. Chrestman* that guide its determination on the question of pretrial release with respect to individual defendants charged in connection with the events of January 6. Those factors are:

1. Whether the charged offenses are felonies or misdemeanors;

2. Whether the defendant engaged in prior planning, for example, by bringing a dangerous weapon;

3. Whether the defendant coordinated with others and acted deliberately in such a way as to amplify or assure the success of the breach of the Capitol;

4. Whether the defendant assumed either a formal or de facto leadership role in the assault, for example, by urging rioters to advance or confronting law enforcement;

5. Whether the defendant breached the interior of the Capitol building;

6. Whether the defendant injured, attempted to injure or threatened to injure others or damaged federal property; and

7. Whether the defendant actively threatened or confronted federal officials or law enforcement or otherwise promoted efforts to disrupt the electoral vote certification, thereby encouraging others to engage in such conduct.

As to Mr. McGREW, the answers to those questions are simple:

1. He is charged with both felony and misdemeanor offenses;

2. There is no evidence of prior planning – the "weapon" he is alleged to have used was an item being passed among members of the crowd.

3.   There is no evidence of coordinating with others for any purpose –
     unless the government wants to argue that attending with his mother
     because she was afraid to go alone is "coordinating" in some malign
     fashion.

4.   He was not part of any "group" – except the "group" consisting of him
     and his mother.

5.   He did go inside the Capitol, but did not break in or do any damage in
     doing so. The government is aware of his entry point even though
     nearly five months after the event the TFO Good stated in his affidavit
     he was not so aware.  The 40-minute CCTV video of the Upper West
     Terrance entrance released by order of Judge Kelly on October 18
     shows Mr. McGREW entering through doors opened by Capitol Police
     who motioned protesters to come inside the building;

6.   He is charged with assaulting a police officer with a dangerous weapon
     – "a pole" -- but there is no evidence in the record regarding his alleged
     use of "a pole," and;

7.   He was involved in verbal exchanges with law enforcement officers but
     there is no evidence that he overtly threatened anyone with violence.

The only factor that favors detention is the first one – Mr. McGREW has been

charged with felony offenses.  But the only factual evidence in the record are the

allegations made by TFO Good in his Affidavit, as commented on during the Proffer

by the government at the detention hearing.  That Affidavit makes no mention of "a

pole", and the government acknowledges that it only discovered that evidence after

Mr. McGREW was arrested and detained in Arizona.

In addition, allegations made by TFO Good in his Affidavit or alleged felony

acts by Mr. McGREW were not ultimately charged in the indictment.  The only

conclusion from that fact is that the government recognized the weakness of TFO

Good's allegations with respect to that event.

Finally, the defense is now aware of video evidence in the government's possession that contradicts some of TFO Good's claims in his Affidavit. Specifically, Mr. McGREW is aware that another detainee has been provided video evidence in a different case showing Mr. McGREW picking up a police baton off the floor inside the Capitol Rotunda and handing it back to the Officer. The prosecutor in this case confirmed to defense counsel that she has not seen that video and asked for identifying information. *Kyles v. Whitley*, 514 U.S. 419 (1995) makes irrelevant the excuse that the prosecutor in this particular case has not seen this particular video. The fact is that it exists, it is in the government's possession, and it contradicts allegations of "violent" conduct the government has made against Mr. McGREW as part of the record evidence to support its request that he be detained.

Mr. McGREW has made a written demand to the government that it produce this evidence for the Court to view.

Mr. McGREW requests an evidentiary hearing and an opportunity to cross-examine TFO Jordan Good regarding his actions – and inaction -- in connection with the investigation of Mr. McGREW as detailed herein.

The factual information set forth herein is made by way of "proffer". Much of the factual detail is taken from two Affidavits signed by TFO Good – the Affidavit in support of the criminal complaint already referenced, and a second Affidavit in support of a search warrant for electronic devices seized at the time of Mr. McGREW's arrest. Counsel for Mr. McGREW will provide declarations as to the proffered facts prior to a hearing on this motion if directed to do so by the Court.

**A.    Evidence in the Record Regarding Dangerousness**

    1.    Nature and Circumstances of the Felony Offenses Charged.

        a)    Counts One and Two: Civil Disorder and Obstructing an
<u>Official Proceeding</u>.

Although they are felonies, Counts One and Two are not "crimes of violence" as referenced in the Section 3142.  Absent allegations of violence directly connected to these two charges – and there is none – the fact that they are felony offenses is of no relevance on the issue of whether Mr. McGREW would pose a "danger to the community" if released on conditions of pretrial release pending trial.

        b)    <u>Counts Three and Four -- Assault on Police</u>.

Mr. McGREW is charged with two counts of violating 18 U.S.C. § 111 -- under subparagraph (a)(1) in Count Three, and under subparagraphs (a)(1) and (b) in Count Four. Count Four alleges that Mr. DeGREW used a "deadly or dangerous weapon" during the course of the charged assault. The weapon is described in Count Four as "a pole."

The government has confirmed to defense counsel that, at this point, it cannot identify a specific victim as to Count Three.  Further, the government has confirmed that it will not identify a victim as to Count Four because Mr. McGREW did not assault or threaten any specific law enforcement officer with the "pole" – an item that he possessed for precisely 12 seconds on January 6.

The key consideration for this Court upon review of the prior detention order is whether the government's record evidence of dangerousness – based on the

8

factual allegations made with respect to the two episodes charged as crimes -- is sufficiently articulable as to a threat that would extend into the future should he be released, and that cannot be mitigated by conditions imposed by this Court. This is a "factbound inquiry" that turns on the actual conduct of Mr. McGREW on January 6, and not just the captions of the statutory provisions set forth in the indictment.

The record evidence put forward by the government as to Count Three and Four is the Complaint Affidavit of TFO Good.  The first reference to Mr. McGREW in that Affidavit is at pages 2-3, but only with respect to him being identified as an individual present inside the Capitol on January 6.

Beginning at the bottom of page 3, TFO Good begins making allegations of criminal conduct attributed to Mr. McGREW:

> In the video, MCGREW aggressively approached law enforcement officers, yelling statements such as "we're coming in here, whether you like it or not" and "fight with us, not against us."  At one point, as MCGREW continued to hold up his phone, MCGREW began to name the officers standing before him and their badge numbers.

Describing someone else as acting "aggressively" is a characterization, not evidence of a fact. Presumably TFO Good was not present on January 6, did not interact with Mr. McGREW, and did not hear the words he spoke. TFO Good's opinion about what is reflected on the video in this exchange is just that – an opinion.  Beyond his characterization, nothing attributed to Mr. McGREW in this paragraph, either his conduct or his actions, suggests a threat of "danger" that would extend into the future should Mr. McGREW be released.

The next two paragraphs, at the bottom of page 3 and continuing to page 4, contain a mix of observations by TFO Good:

> "At 3:05 pm, body worn camera footage placed MCGREW inside the Rotunda.  According to multiple videos, law enforcement agents attempt to push rioters back to force them towards one exit door.  After MCGREW was pushed back with the crowd, <u>MCGREW lunged forward to strike a law enforcement officer</u>."

> After hitting a law enforcement officer, MCGREW retreated away, as law enforcement officers continued to yell to the rioters, "move back."

While body worn camara footage does place Mr. McGREW inside the Rotunda after 3:00 p.m., TFO Good did not include a still image from any body worn camara showing Mr. McGREW striking any law enforcement officer. Presumably if there was clear video of that taking place, TFO Good would have used a still image from such a clear video and the government would know who the victim was.  The Affidavit does include a still image from what is likely a CCTV camera a significant distance away that shows a large crowd of people inside the Rotunda.  There is an arrow pointing at one figure in the crowd TFO Good claims is Mr. McGREW. But the still image doesn't show an assault.

A third image on page 4 does appear to be from a body-worn camera, but other than seeing the top of Mr. McGREW's head from his ears and nose up, nothing more can be seen in that image – certainly not evidence of any assault.

On page 5 of his Affidavit, TFO Good writes:

> "Within seconds, McGREW disobeyed law enforcements' commands and moved forward to again approach the officers.

> At one point, as McGrew continued to scream at law enforcement officers, a law enforcement officer calmly told McGrew, "just leave, just leave man, come on."  McGREW screamed back "You leave.  You leave. This is our house."

These two paragraphs do not describe violent conduct on Mr. McGREW's part, nor do the two still-images TFO Good inserted in the text at this point. What the images do show is Mr. McGREW using his smart phone to videotape the law enforcement officers standing in front of him.

On page 6 of the Affidavit, TFO Good wrote:

> Law enforcement officers attempted to again move the rioters towards the door, using their baton to push the rioters back and repeatedly stating, "move back."  As the law enforcement officers moved MCGREW back, <u>MCGREW struck another law enforcement officer</u>.

**The prosecutor has advised defense counsel that this episode is NOT charged as a crime in the indictment**.  Presumably, the evidence reviewed by TFO Good is not sufficient to establish assaultive behavior by Mr. McGREW, and should be disregarded by this Court for purposes of reviewing the detention order.

TFO Good included a photograph of Mr. McGREW that shows him only from the neck up.  He is holding a cell phone in his right hand at about the same height as his head. No other part of Mr. McGREW's body can be seen in the image.  There is nothing reflected in this still-image that supports TFO Good's allegation that MCGREW struck another officer. This anomaly should be taken into account when considering the credibility of TFO Good's other allegations concerning Mr. McGREW.

Finally, in his final reference to Mr. McGREW's alleged conduct inside the Capitol, TFO Good wrote:

"<u>MCGREW then lunged for the law enforcement officer's baton</u>."

Below this single sentence is one still image from a body-worn camera that shows Mr. McGREW from the waist up.  He is still holding his camera in his right hand while taking video, and his left arm is outstretched in front of him, with the fingers of his left hand on top of the gloved-hand of a law enforcement officer holding onto a baton.  The still image does not show a "lunge" nor does it show Mr. McGREW grabbing or attempting to take the baton away from the officer.

**This "observation" made by TFO Good is also not part of any charged criminal act set forth in the indictment**.

The claim that Mr. McGREW "lunged for the law enforcement officer's baton" is contradicted by the video showing Mr. McGREW picking up a different baton off the floor and handing it back to a different law enforcement officer.  This further undermines the claims by the government that Mr. McGREW's actions on January 6 show him to be a "danger to the community" who must be detained pending trial.

That is it – that is the totality of the record evidence regarding alleged violent conduct by Mr. McGREW on January 6.

As to Count Four, alleging assault with a dangerous weapon – "a pole" – there is no reference in TFO Good's Affidavit to this episode.  The prosecutor has stated to defense counsel that this evidence was discovered between the date of TFO Good's Affidavit and the return of the Indictment by the grand jury.

The defense has seen video of an episode involving "a pole" outside the Lower West Terrance Entrance to the Capitol, not inside the Rotunda. The "pole" appears to be a handrailing with small brackets at both ends with which it had been attached to a wall somewhere.

The events in the video depict a period of time when Mr. McGREW had become separated from his mother by the movement of the crowd following the use of tear gas by the law enforcement agents outside the Tunnel to the West Terrance Entrance. Unknown to him, his mother – 5'2" and 105 pounds – had retreated and climbed up some scaffolding to escape being trampled by the crowd.

Initially Mr. McGREW was trapped in the crowd on the steps leading up to the Tunnel Entrance. Because of the mass of people behind him he was unable to retreat. Over several minutes he slowly made his way forward in the crowd until he reached a position just to the right of the Tunnel entrance, and was no longer being pushed from behind by the crowd. From that location Mr. McGREW yelled for the crowd to back up because it was crushing people at the front who were being blocked from entering the Capitol through the tunnel. While he was in that location, both law enforcement officers and protesters began using chemical agents, each in the direction of the other. Video shows that Mr. McGREW stepped away from the tunnel entrance while a person standing next to him poured water onto his face and eyes.

Not long after, the white handrailing appears to be passed backwards in the crowd from inside the tunnel. Mr. McGREW was using a small outcropping against

the side of the building to stand approximately one foot off the ground so he could see over the top of the crowd and inside the tunnel.  He grabbed the handrailing with his left hand – Mr. McGrew is right-handed.  After looking behind him to make sure he wasn't going to hit anyone, he used his non-dominant left hand to attempt to toss the railing back inside the tunnel.  As the video shows, with his non-dominant left-hand Mr. McGREW managed to toss the pole MAYBE two feet. Using the time stamp on the video, Mr. McGREW had the railing in his left hand for a total of 12 seconds from the time he grabbed it to the time he tossed it back inside the tunnel.

From Mr. McGREW's location <u>outside the tunnel</u>, the closest law enforcement officers to him were several feet inside the tunnel.  Mr. McGREW's recollection is that at the point in time he tossed the railing he was still separated from law enforcement officers inside the tunnel by as much as 10-15 feet, with a crowd of a dozen or more protesters between him and the officers.  He made no effort to toss the railing that distance, and the government concedes the railing did not hit any officer.

Had Mr. McGREW intended to hit anyone with the railing he could have easily shifted it to his right hand, stepped down off the small outcropping from the building he was standing on, and easily thrown it with force the full distance to where the officers were standing inside the tunnel.

He did none of those things.

     c)     Counts Five, Six, and Seven -- Remaining in a Restricted <u>Building with A "Dangerous Weapon</u>."

TFO Good's Affidavit alleges there was probable cause to believe that Mr. McGREW violated 18 U.S.C. Section 1752(a).  Neither his Affidavit nor the Criminal Complaint alleges probable cause that Mr. McGREW violated subparagraph (b)(2) – the felony provision which involves possession of a deadly or dangerous weapon.

The indictment is the first instance – without any particularized factual allegations – where the government claimed that a "deadly or dangerous weapon" was possessed by Mr. McGREW, and that the "weapon" in question was "a pole" according to the Indictment.

The entirety of the episode involving "a pole" – the handrailing – involves the 12 seconds of "possession" by Mr. McGREW is detailed above.

To the extent TFO Good's Affidavit supports the claim that Mr. McGREW violated section 1752, it only addresses the misdemeanor provision in the statute and not the felony provision so the record evidence before this Court includes only the bare allegations of the Indictment.

     d)     <u>Counts Eight, Nine, and Ten:  Unlawful Parading, etc</u>.

Counts Eight, Nine and Ten are the same "B" Misdemeanors offenses that the government has charged against nearly every January 6 protester.  The nature and circumstances of those offenses should have no impact on the decision to release Mr. McGREW on terms and conditions of supervised release.

**B.      Record Evidence Regarding "Risk of Flight".**

1.      <u>Weight of the Evidence Against the Defendant</u>

At the risk of citing a legal truism that is no mystery to this Court, this factor is not meant to "prejudge" the defendant's guilt, but rather to consider how the strength of the government's case and weight of the evidence against a defendant might "motivate" that defendant to fail to appear at future court proceedings.

While the government is likely to respond by pointing to video of Mr. McGREW's actions on January 6, as outlined above there are serious questions with respect to how compelling the government's evidence regarding violence by Mr. McGREW actually is.  Thus, the "weight" of the government's evidence – taking into account the incongruities between TFO Good's Affidavit and the offenses actually charged -- might not be commensurate with the government's claims regarding that evidence.

Mr. McGREW expects that when all the evidence is reviewed as to him, the government may see fit to offer him a disposition that it has now offered in numerous cases, with increasing frequency:  dismissal of felony counts in exchange for a guilty plea to a misdemeanor.

2.      <u>The History and Personal Characteristics of Mr. McGREW.</u>

D.C. Circuit case law states that courts should consider personal factors involving the defendant's background, including his education, assets, employment, family, and other personal ties to the United States and the jurisdiction where he would be released. *See United States v. Nwokoro*, 651 F.3d 108, 110-11 (D.C.Cir. 2011) (*per curiam*). These factors are also identified in the statute. *See* 18 U.S.C. §

3142(g)(3)(A).  When considered in context and as a whole, Mr. McGREW's personal history supports the proposed release on the combination of conditions proposed.

a)   Mr. McGREW's Military Service.

As noted at the beginning of this motion, Mr. McGREW enlisted in the United States Marine Corps in March 2003 at the age of 21, a time of active U.S. military operations in both Iraq and Afghanistan.

His Marine Corps unit deployed to Fallujah, Iraq as part of the "surge" of U.S. forces in April 2005.  He was injured in July 2005 by an IED explosion that destroyed the Humvee he was traveling in.  Although injured, he remained with his unit until it rotated back to the United States in September 2005.

He was medically discharged in January 2007 with a 60% hearing loss and has had several surgeries to address the issue.  He's been treated by the VA for several medical issues for over a decade.  He has continuing medical needs for which he receives care at the Biloxi, Mississippi VA Hospital, and there are no circumstances under which it is conceivable that Mr. McGREW would give up his access to that care.

b)   Mr. McGREW's Criminal History

Mr. McGREW cannot hide from his criminal history, and he is not asking the Court to overlook it.

In 2008, following his discharge from the Marine Corps, Mr. McGREW began a series of encounters with law enforcement which are well documented in the Report of Pretrial Services. Nearly all of Mr. McGREW's difficulties in this regard had as their root cause his addiction to controlled substances after his discharge.

Some of the shoplifting charges in his criminal history relate to stealing the precursor chemicals for the clandestine manufacture of methamphetamine. Mr. McGREW would steal cold medications containing pseudoephedrine from retail establishments and trade those medications for finished methamphetamine for his personal use.

Other shoplifting charges are the result of Mr. McGREW's need for money to buy drugs to satisfy his addiction.

Mr. McGREW's criminal history shows he suffered no convictions after mid-2016.

In the summer of 2020 Mr. McGREW had a relapse while still on probation in Mississippi and was involved in an automobile accident. As an alternative to violating Mr. McGREW's probation and returning him to jail, Mississippi Probation Officer Allison Long diverted Mr. McGREW to treatment, and he successfully completed a 30-day in-patient treatment program in August 2020 at the Journey Pure treatment center in Panama City, Florida.

Upon completion of that 30-day program, Mr. McGREW received permission from his Probation Officer to participate in a six-month residential treatment program at Southern California Recovery Center in Carlsbad, California. Mr. McGREW's counselor at the SCRC sent monthly reports to Ms. Long regarding Mr. McGREW's progress. Mr. McGREW obtained employment in that area in October 2020 and began a personal relationship with a young woman he met there.

In December 2020 Mr. McGREW enrolled in Palomar Community College in nearby Vista, California to pursue a degree in Alcohol and Drug Dependency Studies with the goal of becoming a counselor.

In March 2021 Mr. McGREW successfully completed the six-month recovery program at SCRC.

<i>c)</i>   <u>Mr. McGREW's Attendance at the January 6 Protest</u>.

In late December Mr. McGREW spoke with his mother about her desire to attend the "Stop The Steal" rally on January 6.  She had planned to attend the rally with a friend in Biloxi but those plans fell through.  She did not feel safe attending the event by herself.  Mr. McGREW obtained a pass from the SCRC facility staff – he did not need to obtain additional permission from this Probation Officer in Mississippi – and flew to Washington to meet his mother on the evening of January 5.  They attended the rally together on January 6, and then went with the crowd to the Capitol.

On January 7th the two visited other monuments and landmarks in Washington, and later that evening Mr. McGREW's mother flew back to Mississippi and he flew back to California.

Mr. McGREW had no connection or contact with any group present at the Capitol that day.

<i>d)</i>   <u>Mr. McGREW's Travels from March to May 2021</u>.

In March 2021 Mr. McGREW graduated from the six-month sober living program at the SCRC, moving out of that facility and into a residence with his then

19

girlfriend.  On or about April 23, 2021, Mr. McGrew's girlfriend saw photos of him at the protest on January 6, and she ended their relationship and asked him to move out of the residence they shared.  On April 24, 2021, he arranged to move into a sober living house in Vista, California.

On April 26, 2021, Mr. McGREW flew from California to Biloxi, Mississippi for an in-person meeting with his Probation Officer scheduled for April 28, 2021.

During the day on April 27, Mr. McGREW departed his mother's residence in Biloxi in his pickup truck without telling his mother where he was going.  After being unable to reach him for several hours and fearing that he might be intending to harm himself out of depression over the break-up with his girlfriend, Mr. McGREW's mother reported him "missing" to the local police.  Approximately three hours after doing so Mr. McGREW called his mother and told her he was driving in the direction of her home, but was not feeling well.  She told him to stop the car, and she would come to him as he was only a short distance away.

It was clear when she found Mr. McGREW that he was in physical distress and right leg was extremely swollen.  After stopping briefly back at her house to get him water and a few personal belongings, his mother drove Mr. McGREW to the VA Hospital in Biloxi.  Mr. McGREW was admitted that night with near total kidney failure.  He was placed in the ICU and started on dialysis.

Mr. McGREW spent over two weeks in the VA Hospital, being released on May 12, 2021. At that point he had regained only about 60% kidney function.  He

also had chronic pain on the right side of his body and needed the assistance of a walker.

Following his release, Mr. McGREW was taken by his sister, Brandy Clayton, to meet his Probation Officer in Biloxi on May 13, 2021.  His sister had come to Mississippi from her home in from Arizona to assist with his care after his release from the VA Hospital.  Mr. McGREW had not been in contact with Probation Officer Long since leaving California on April 26.  She told Mr. McGREW that she had received information about the breakup with his girlfriend, and she assumed he had simply dropped out of contact as a result.  Ms. Long was able to verify his hospital stay and the severity of his medical problems.  But, during the time he was out of contact she cancelled his application to reside in California.

Ms. Long gave Mr. McGREW permission to travel to California to retrieve the personal belongings he left at the sober living house after moving out of his girlfriend's residence on April 23.  But he was required to personally report to her in Mississippi every month until relocation arrangements outside Mississippi were in place.

On May 18 Mr. McGREW's sister agreed that he could live with her in Arizona.  Mr. McGREW sent an email to his Probation Officer explaining he was leaving for California to pick up his belongings as she had approved, and then take them to his sister's residence in Arizona. He provided his sister's address in the email.  He knew he still had to check in monthly with Ms. Long in person, and that he would need her approval to relocate to Arizona before doing so.

Mr. McGREW left for California on May 18, arriving at his sister's residence near Phoenix on May 19.  On May 20 he continued from there on to California.

The government knows Mr. McGREW came into contact with US Border Patrol Agents on May 20, 2021, at the Campo Border Patrol Station in Pine Valley, California, along I-8 between Phoenix to San Diego.  That fact is set forth in one of TFO Good's affidavits. Not noted, however, is that this Border Patrol Station is approximately 20 miles inside the United States, and not on the US-Mexico border.

After arriving back in the northern San Diego area (Carlsbad-Oceanside),  Mr McGREW made several attempts to contact his ex-girlfriend in an effort to repair their relationship. Unknown to Mr. McGREW, his ex-girlfriend was in contact with the FBI and was providing information about his whereabouts.

Mr. McGREW rented a room at the Vista Inn in Vista, California.

On May 23 Mr. McGREW met a woman outside the hotel and they agreed to take a day-trip to Tijuana that same day. Mr. McGREW had never visited Tijuana in the months he lived in San Diego, so he decided to make the trip before leaving for Arizona. He left his belongings in his room at the Vista Inn.

While heading back into the United States later that day, Mr. McGREW encountered heavy traffic approaching the border crossing at San Ysidro.  Not having entered the United States in this fashion before, Mr. McGREW took the "advice" of another driver to take a short cut. As it turned out this driver sent him to a "SENTRI" lane that was for pre-approved travelers with an electronic pass to cross the border.

Mr. McGREW was stopped by Customs and Border Protection Officers and issued a warning citation for using the SENTRI lane without authorization. He was directed to secondary inspection and detained while his truck was searched. Mr. McGREW was strip-searched and questioned. He told the agents he was going back to the Vista Inn where his belongings were and his room was already paid for.

On May 25 Mr. McGREW drove from San Diego to his sister's residence in Arizona – the location where he had emailed his Mississippi Probation Officer he would be stopping at after picking up his belongings in California.

On May 27 Mr. McGREW took his final exams at Palomar College online while at his sister's house.

On the morning of May 28, Mr. McGREW was arrested in that same location.

TFO Good's Affidavit states that Mr. McGREW was positively identified by photographs of events on January 6 submitted by a cooperating individual on March 3. Yet as of May 23 when Mr. DeGREW was detained at the border, there was no criminal complaint or warrant for his arrest. TFO Good's Affidavit is dated May 26. A criminal complaint and arrest warrant were first sought and obtained from this Court on May 27.

> e. The Government's Lack of Urgency in Arresting Mr.
> <u>McGREW Belies Its Claims That He Is A Flight Risk or Danger</u>

Nothing about Mr. McGREW's travels from the time he left California on or about April 26 until his arrest on May 28 suggest he is a "flight risk" or a "danger".

This is established most emphatically by the obvious lack of urgency felt by the FBI and Department of Justice to take Mr. McGREW in custody between April

29 – when his ex-girlfriend told the FBI Mr. McGREW had returned to Mississippi to meet with his Probation Officer -- and May 28 when the FBI made its first attempt to arrest him. The FBI passed on multiple opportunities to arrest him prior to May 28.

The government's admission in this regard can even be traced back as far as March 3 based on TFO Good's representation that he received a positive identification of Mr. McGREW in photographs showing him inside the Capitol.

This passage of time makes the government's claims that it views Mr. McGREW as a "flight risk" or "danger to the community" ring hollow given that clearly wasn't the case from the beginning of March to the end of May, 2021:

| April 29: | TFO Good interviewed Mr. McGREW's ex-girlfriend, and she told him that Mr. McGREW had returned to Mississippi to meet his Probation Officer. She also told him that she had received a message from McGREW that day that he was in the ICU of the Biloxi VA Hospital. |
|-----------|---|
| May 7: | The FBI obtained a cell phone tracking warrant, including real-time tracking and geo-location information. The FBI knew Mr. McGREW's cell phone was in Mississippi, and could track it within 90 meters according to TFO Good. |
| May 18: | The FBI knew the cell phone left Mississippi via the tracking warrant. |
| May 19: | The FBI knew the cell phone was in Arizona via the tracking warrant. |
| May 19: | The FBI executed a search warrant at the Sober Living House Mr. McGREW had intended to move into. They had known Mr. McGREW's personal belongings were at that location since their April 29 interview with Mr. McGREW's ex-girlfriend – she told them she delivered his personal items to that location. |

May 20:      Mr. McGREW had contact with Border Patrol Officers in Pine
             Valley, California, which is along the I-8 route from Phoenix to
             San Diego.

May 23:      Mr. McGREW was stopped, detained, and questioned by
             Customs and Border Protection Officers at the San Ysidro Port
             of Entry in California.

May 26:      The earliest TFO Good could be troubled to draft an Affidavit in
             Support of a Criminal Complaint and Arrest Warrant.

May 28:      Mr. McGREW was taken into custody at his sister's residence –
             exactly where he had told his Probation Officer and the Customs
             and Border Protection Officers he was going.

This sequence of events makes clear that in the nearly three full months

prior to May 28, 2021 when the government asked that Mr. McGREW be detained

in Arizona, the FBI and DOJ did not consider him a "flight risk" or "danger to the

community."  They had the same evidence to charge him in beginning of March that

they had at the end of May, they knew his whereabouts, yet they made no effort to

take him into custody before May 28.

Not only that, TFO Good could not take the time to draft the Affidavit to

obtain a criminal complaint and arrest warrant to have pending if Mr. McGREW

happened to come into unexpected contact with law enforcement – which he did

twice.

C.      **Plan for Release on Terms and Conditions of Pretrial Release**

The details of Mr. McGREW's proposed conditions of supervised release will

be provided to Pretrial Services shortly after this motion is filed.  Mr. McGREW

intends to live with a relative who will serve as his third party custodian.  To the

extent that Mr. McGREW is physically able to work, the relative will provide him

with employment in a business co-owned by the relative.


Date: October 21, 2021                    Respectfully Submitted,


John M. Pierce
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
Tel: (213) 400-0725
Email: jpierce@piercebainbridge.com

Attorney for Defendant James Burton McGrew

## <u>CERTIFICATE OF SERVICE</u>

I, John M. Pierce, hereby certify that on this day, October 21, 2021, I caused

a copy of the foregoing document to be served on all counsel through the Court's

CM/ECF case filing system.


/s/ John M. Pierce
John M. Pierce