**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 21-cr-398-BAH** |
| | **:** | |
| **JAMES MCGREW,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR RECONSIDERATION OF THE DETENTION ORDER

On October 21, 2021, the defendant, James McGrew, filed a Motion for Reconsideration of Detention Order [#23], requesting release following the June 4, 2021 detention order issued by U.S. Magistrate Judge John Z. Boyle in the District of Arizona. For the reasons set forth below, the government requests that motion be denied.

## I.      BACKGROUND

### A.      The Attack on the U.S. Capitol on January 6, 2021

On January 6, 2021, a joint session of the U.S. Congress convened at the U.S. Capitol. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police ("USCP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol. On that day, the exterior plaza of the Capitol was also closed to members of the public. During the joint session, elected members of the U.S. House of Representatives and the U.S. Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 pm. Shortly thereafter, by approximately 1:30 pm, the House and Senate

adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 pm, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of the USCP, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 pm, members of the House of Representatives and Senate, including the President of the Senate, Vice President Mike Pence, were instructed to— and did—evacuate the chambers.  Accordingly, the joint session of Congress was effectively suspended until shortly after 8:00 pm.  Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During the violent riot, numerous individuals were involved in assaults against law enforcement officers, which occurred both inside of the Capitol, as well as on the steps outside of the Capitol and the grounds of the Capitol.  Some of these assaults resulted in injury to officers who were attempting to protect the U.S. Capitol and the individuals inside of the building. While a number of the individuals who assaulted officers were unarmed, others were armed with weapons including bats, sticks, poles, stun guns, and chemical spray.  The defendant, as detailed below, is

charged with assaulting officers with a dangerous weapon, specifically with a pole, as well as other assaultive behavior and related crimes.

### B.        The Defendant's Conduct on January 6, 2021

To summarize, the defendant enthusiastically participated in several key moments during the attack on the U.S. Capitol Building on January 6, 2021.  First, at approximately 2:32 pm, the defendant was at the front line of rioters as they overran one of the initial police defensive lines on the West Plaza, cheering their victory.  The defendant then climbed up onto the Upper West Terrace and entered the Capitol at approximately 2:45 pm through the temporarily unguarded Upper West Terrace Doors.[1]  The defendant then entered the Great Rotunda, where he physically assaulted and verbally engaged with law enforcement officers and was sprayed with tear gas. The defendant then exited the building through the East Rotunda Doors, crossed around the entire building, only to return to the West Front where he joined the ongoing and major melee at the Lower West Terrace's Inaugural Archway, often referred to as "the tunnel."  While there, the defendant hurled a long pole, with a metal hook on the end, towards a line of officers packed together in the ten-foot-wide tunnel.  The defendant then joined other rioters in collectively heaving against the police line to push it back.  In all, the defendant spent nearly two hours actively engaged in increasingly violent behavior in order to frustrate efforts of law enforcement to keep rioters out of U.S. Capitol building.

The defendant first appeared in open-source video of the chaos on the West Plaza as law enforcement retreated from their semicircular defensive line at the foot of the inauguration stage.

---

[1] The defendant is correct that his entry location was not included in the Criminal Complaint affidavit.  The defendant's entry location was discovered after his arrest and before the Indictment.

As the crowd surged forward, assaulting the retreating officers with fists, makeshift weapons, and various chemical sprays, the defendant was visible near the front of the mob.



In the same video, the defendant worked his way to the front of the crowd where he was face to face with a handful of officers protecting the larger group of retreating law enforcement officers.  For several seconds, the defendant faced the officers with his arm raised.



Moments later, it appeared the defendant was impacted by a chemical agent, which caused him to fall back, take off his hat and scarf, cough and spit, and then lift his shirt to wipe his eyes, nose and mouth, revealing his distinctive stomach tattoo, as shown in the below series:



The defendant then approached the foot of the stairs up onto the inaugural stage, where the last of the officers had retreated.  The defendant then joined other rioters in a chant of, "Whose house?  Our House!"



At 2:45 pm, the defendant entered through the unguarded Upper West Terrace doorway, as captured in United States Capitol Police surveillance footage ("CCTV").  Shortly thereafter, at 2:52 pm, the defendant appeared on the body worn camera ("BWC") of a Metropolitan Police Officer ("MPD"), confronting law enforcement officers who refused to let rioters past them near the Old Senate Chamber.  During the exchange, the defendant repeatedly yelled statements to the officers, such as "We're coming in here, whether you like it or not" and "Fight with us, not against us."  The defendant also filmed the officers on his phone, shouting their badge numbers and their names.

At approximately 2:58 pm, the defendant made his way to the Rotunda.  Upon entering, the defendant had two separate interactions with law enforcement officers for which he is charged.[2]  Prior to the first interaction, law enforcement officers had entered the Rotunda and begun the process of moving rioters out of the room towards the East Rotunda Doors exit. During the first interaction, at approximately 3:05 pm, the defendant first pushed an unknown officer and then struck an MPD officer standing before him.  The BWC footage—from a third officer—depicted the back of the assaulted officer's head briefly during the strike.[3]  The defendant's striking of the officer during this first assault is the basis of the 18 U.S.C. § 111(a)(1) charge listed in Count Three of the Indictment, as reflected in the below picture:

---

[2] The undersigned attorney told defense counsel that the conduct referenced in the defendant's motion on page 12 was not the basis of the 18 U.S.C. § 111(a)(1) charge, not that the government did not charge the conduct.  There are two charges stemming from the defendant's conduct in the Rotunda, an 18 U.S.C. § 111(a)(1) charge and an 18 U.S.C. § 231(a)(3) charge.

[3] Given the officer's brief appearance on the camera, the government is still in the process of attempting to identify the officer.



After assaulting the MPD officer, the defendant retreated several feet from the police line, but did not leave the Rotunda.  Seconds later, the defendant moved forward, re-approaching the officers while screaming.  When an officer calmly told the defendant, "just leave, just leave man, come on," the defendant responded by screaming, "You leave.  You leave.  This is our house."

Again, the officers began attempting to move the rioters across the room to the exit closest to the East Rotunda Doors.  At approximately 3:07 pm, when an officer used his baton to attempt to push the defendant and other rioters closer to the exit, the defendant struck the officer and lunged for the officer's baton.  The striking of the law enforcement, the attempt to grab the baton, and the defendant's general obstructive behavior as law enforcement officers attempted to clear the room are the basis of the 18 U.S.C. § 231(a)(3) charge.

At approximately 3:08 pm, the defendant engaged in another altercation with another

officer. [4]   As an MPD officer wearing a BWC approached the defendant, the officer repeatedly stated to the defendant and others, "Back up, back up."  A struggle ensued between the officer and the defendant.  During the struggle, the officer grabbed the defendant's shirt and stated twice, "Yo don't hurt me like that," and the defendant lifted his hands.  As the defendant and the officer began to struggle again, the defendant grabbed another officer's baton, stating, "Quit hitting people," to which the officer wearing the BWC responded, "Just back up man, just back up bro, just back up that's all."  The defendant then returned the baton and the officer stated, "Thank you," to which the defendant gestured, presumably to another officer, stating, "Tell him to quit hitting people, give it to him, he's right behind you."  Seconds later, the defendant began to shout "Lock arms" to other rioters and then proceeded to lock arms and stand still, in defiance of the officers' orders.

It should be noted that during the subsequent melee in which the defendant was forcibly removed from the room, law enforcement officers appeared to have pepper sprayed the defendant.  After being removed from the Rotunda, the defendant then appeared on CCTV video near the East Rotunda Doors and exited the U.S. Capitol through the doors at 3:22 pm.  A screenshot is below:

---

[4] This paragraph references the video which supposedly depicted the defendant picking up a baton and returning it to officers, as described on page 8 of the defendant's motion.  The government provided a copy of the video to defense counsel on October 23, 2021.



However, despite the officers' request for the defendant to leave, and even after officers pepper sprayed the defendant on at least two separate occasions and locations, the defendant did not leave the vicinity of the U.S. Capitol.  Around 45 minutes later, at approximately 4:07 pm, the defendant reappeared on CCTV footage in the front of the Lower West Terrace tunnel.[5]

At around 4:00 pm, other rioters were visibly throwing objects and spraying chemical spray at the law enforcement officers in the Lower West Terrace tunnel, and one rioter was hanging off the arch, kicking at officers and using a metal pole as an improvised spear to stab at them.[6]

In the 45 minutes that had passed, the defendant had traveled from the east side to the west side of the Capitol, and despite the chaos, violence, pepper spraying, and sheer number of

---

[5] On January 6, 2021, scaffolding and platforms had been constructed on and around the Lower West Terrace in anticipation of the Presidential inauguration.  In the center of the Lower West Terrace, an archway and tunnel had been constructed around a staircase where, at the inauguration, the President, Vice President, and other government officials would process onto the inauguration stage.  It was also the site of some of the worst, and most sustained, violence on January 6, as rioters battled with law enforcement officers who protected this point of entry into the Capitol.  The defendant was one such rioter.

[6] That other rioter was David Nicholas Dempsey, identified by citizen sleuths online as #FlagGaiterCopHater.  Mr. Dempsey has been charged in case number 1:21-cr-00566-RCL and is detained pending trial.

rioters crowding the vicinity of the Lower West Terrace, the defendant managed to reach the forefront of the tunnel.

In the CCTV footage, the defendant did not look for his mother; he was moving forward. In fact, as depicted below, prior to reaching the front of the tunnel, the defendant assisted other rioters in moving a ladder forward towards the entrance of the tunnel.



The defendant then approached the law enforcement officers at the entrance of the tunnel, clearly watching the violence at the entrance unfold as he moved forward:



As he arrived at the entrance, the defendant was almost immediately sprayed with a chemical agent by a rioter.  The defendant then appeared to fall to the ground under the weight of another rioter and was on the ground for about 45 seconds before rising and retreating.

At approximately 4:13 pm, as the defendant was standing near the mouth of the tunnel, another rioter handed the defendant a pole, almost the same height as the defendant, which the defendant accepted with his left hand.  The defendant then positioned the pole over his head and launched the pole into the tunnel, notably throwing the pole end with a metal hook towards the law enforcement officers.  The pole appeared to hit another rioter and/or the shield/visor of an officer, thus tempering what likely would have been a serious injury to an officer within the tunnel.  The officers within the tunnel then grabbed the pole and passed the pole back towards other officers.[7]  This conduct is the basis of further charges against the defendant (Counts 4 through 7 of the Indictment), including (1) assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); (2) entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); (3) disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); and (4) engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A).

Despite the defendant's attempts to minimize his actions at the Lower West Terrace tunnel on pages 14-15 of his motion, claiming that he was about 12 to 15 feet from the officers

---

[7] The FBI discovered the video of the defendant at the Lower West Terrace after May 27, 2021 but before the defendant's detention hearing on June 4, 2021.  However, it does not appear this information was part of the basis of the magistrate judge's ruling.

and "dozens or more" rioters are between him and the officers, the videos speak for themselves.

Screenshots of the defendant with the pole from different angles are below:









While the defendant's recitation of the facts in his motion ends there, the defendant's conduct on January 6, 2021 did not. Even after this conduct, the defendant did not leave the vicinity of the U.S. Capitol.

Despite the prevalence of chemical agents, used by both the police and other rioters, as described in the defendant's motion on page 14, the defendant remained at the front of the tunnel

and continued to attempt to breach the tunnel.  Along with other rioters, in a coordinated effort, the defendant began pushing into the tunnel and pushing the officers within the tunnel back.  The CCTV video depicted the defendant pushing forward, eventually gaining access into the tunnel, until approximately 4:20 pm, when MPD and the USCP officers managed to push the rioters out and regain their holding of the tunnel.   A screenshot of the footage is below:



### C.      The Subsequent FBI Investigation

Following January 6, 2021, the FBI received multiple tips regarding the defendant.  The first, a former co-worker of the defendant, informed the FBI that prior to January 6th, the defendant told the coworker he intended to travel to Washington, D.C. to "protest the stolen vote."  After January 6th, the defendant bragged to another employee about his conduct on January 6th, displaying videos on his phone from inside of the Capitol.

On April 26, 2021, the defendant flew from California to Mississippi.  The defendant appeared for a court hearing the following morning on his three outstanding probation cases in Biloxi, Mississippi.  The following day, the defendant disappeared, and the defendant's mother

filed a "missing" person report to the police.

Unable to locate him, the FBI sought a GPS warrant for the defendant's phone associated with the phone number ending in 2392, and on May 7, 2021, U.S. Magistrate Judge Robin M. Meriweather issued the warrant (21-sc-1476). However, prior to the FBI arresting the defendant, the defendant began to move, driving west from Mississippi. After stopping in Arizona briefly, the defendant left his phone ending in 2392 in Arizona.

Unsure of whether the defendant intended to return to California or whether the phone's lack of movement indicated he was staying in Arizona, on May 19, 2021, the FBI executed a search warrant on the sober living facility in California where the defendant previously resided in the event the defendant returned to California to retrieve his belongings.

On May 23, 2021, the defendant exited the country and traveled to Mexico. The defendant returned on May 24, 2021. During his reentry to the country, the defendant was interviewed by U.S. Customs and Border Protection Officers. During the interview, the defendant stated that he had traveled to Mexico with a homeless woman that he had met outside of the hotel the day before. The defendant provided information as to whereabouts for the past several weeks, explaining that he was hospitalized in Biloxi, Mississippi for Rhabdomyolysis.[8] The defendant further stated he planned to drive to his sister's residence in Arizona.

After the FBI was notified of the interview, the FBI learned that the defendant's license plate had crossed into Arizona again. The FBI then prepared to arrest the defendant.

---

[8] To date, despite requesting information, the government has not been provided any medical records related to the defendant's prior hospital stay in Mississippi, anything related to the defendant's kidney issues, or any documentation related to issues with the defendant's present incarceration.

### D.       The Arrest and Detention of the Defendant

On May 27, 2021, U.S. Magistrate Judge G. Michael Harvey issued a Criminal

Complaint against the defendant (21-mj-452), which charged him with (1) civil disorder, in

violation of 18 U.S.C. § 231(a)(3); (2) obstruction of an official proceeding, in violation of 18

U.S.C. §§ 1512(c)(2),2; (3) assaulting, resisting, or impeding certain officers, in violation of 18

U.S.C. § 111(a)(1); (4) entering and remaining in a restricted building or grounds, in violation of

18 U.S.C. § 1752(a)(1); (5) disorderly and disruptive conduct in a restricted building or grounds,

in violation of 18 U.S.C. § 1752(a)(2); (6) engaging in physical violence in a restricted building

or grounds, in violation of 18 U.S.C. § 1752(a)(4); (7) disorderly conduct in a Capitol building,

in violation of 40 U.S.C. § 5104(e)(2)(D); (8) act of physical violence in the Capitol grounds or

buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and (9) parading, demonstrating, or

picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On May 28, 2021, the FBI arrested the defendant in Glendale, Arizona.  At the time of

his arrest, the FBI seized the defendant's two phones (including the iPhone the defendant used on

January 6th) and his laptop.  After his arrest, the government moved for detention based on the

defendant's danger to the community and risk of flight.  In addition to the government's proffer

and the affidavit accompanying the Criminal Complaint, the District of Arizona's Pretrial

Services Agency ("PSA") also requested detention and provided a lengthy Pretrial Services

Report and Addendum to the Court.

Within the Report, PSA detailed the defendant's extensive criminal history, the

conflicting stories that the defendant and his mother provided about his drug history (the

defendant did not report heroin use while his mother stated that he had been receive inpatient

treatment for heroin twice in the past year), and the defendant's repeated failure to generally

comply with conditions of release.  As to the question of nonappearance, PSA noted the defendant's criminal history, repeated failures to appear, contempt of court violation, violations of probation, a conviction for lying to a police officer, and according to the defendant's Mississippi probation officer, the defendant's failure to receive permission to live in Arizona.  As to the question of danger to the community, PSA noted that the defendant was presently on probation in Mississippi for three state court cases (one drug-related), the defendant's continued participation in criminal activity, as well as the conflicting information the defendant and his mother provided about his mental health.

On June 4, 2021, U.S. Magistrate Judge John Boyle ordered the defendant detained, finding that the defendant was both a danger to the community and at risk of flight.

### E.    The Defendant's iCloud Account

On June 10, 2021, U.S. Magistrate Judge Zia M. Faruqui issued a warrant (21-sc-1938) for the defendant's iCloud account linked to the iPhone the defendant used inside of the Capitol.

The FBI was able to retrieve multiple videos from inside of the defendant's iCloud account from January 6, 2021.  For example, in one footage prior to the defendant's entry through the Upper West Terrace Doors, the defendant filmed the scene around the outside of the Capitol while standing on what appears to be scaffolding, screaming, "Four more years," "Let's go, we need more people," "Come on, come on."  The defendant shouted, "Let's go" approximately 14 times.  At one point, as the camera turned black and the audio played the sounds of barricades being pushed, the defendant yelled, "We took this thing."

The defendant also filmed his presence inside of the Rotunda.  The video began with his entry into the Rotunda and ends prior to his taking the baton from the law enforcement officer at 3:08 pm.  During the video, the defendant can be heard saying, among other things to law

enforcement officers, "Y'all are with us, not against us.  They want to defund the police, you know that right?  They are going to take your fucking job from you and you're fucking defending them."  The defendant repeatedly called the officers, "Traitors" and stated, "We ain't leaving."  Near the end of the video, the defendant yelled, "There are way more of us than y'all, way more . . . there's 2 more million people behind us, who are tried of this shit."

## II.    LEGAL STANDARD

Under the Bail Reform Act, the government may move for detention if a charged offense falls under one of the five enumerated categories within 18 U.S.C. § 3142(f)(1)(A) – (E) or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimate a juror, as cited within 18 U.S.C. § 3142(f)(2)(A)-(B).  See also United States v. Chrestman, 525 F.Supp.3d 14, 21 (D.D.C. 2021).

The government is moving for detention based on the defendant's danger to the community and his risk of flight.  Under § 3142(f)(1), a charge under 18 U.S.C. §§ 111(a)(1) and (b) is considered a crime of violence.  "Crime of violence" is defined in 18 U.S.C. § 3156(a)(4) in part as "(A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another or (B) any other offense that is a felony and that, by its nature, involves substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  A charge under 18 U.S.C. §§ 111(a)(1) and (b) falls within the statute.

To justify detention based on dangerousness, the government must prove by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."  18 U.S.C. § 3142(f); United States v. Munchel, 991 F.3d 1273, 279-80 (D.C. Cir. 2021).  To justify detention based on risk of flight, the

government must demonstrate the appropriateness of detention by a preponderance of the evidence.  United States v. Xulam, 84 F.3d 441, 442 (D.C. Cir. 1996).

Here, both parties are asking the Court to consider evidence outside of the magistrate court's detention ruling on June 5, 2021; specifically, additional evidence from January 6, 2021, including videos of the defendant's returning of a baton while still in the Rotunda and the defendant's conduct near the Lower West Terrace tunnel, as well as electronic evidence obtained from the defendant's iCloud account.  Accordingly, the parties are not asking the Court to make a ruling based on the same record, "the situation [is] more akin to a new hearing."  Munchel, 991 F.3d at 1280.

In determining whether there are any conditions or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the Court considers the following factors: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

## III.   ARGUMENT

### A.   Factors Enumerated in 18 U.S.C. § 3142(g)

#### i.   Nature and Circumstances of the Offense

The nature and circumstances of this offense weigh in favor of detention.  In Chrestman, this Court articulated a set of factors for evaluating the nature and circumstances of offenses committed at the Capitol, and how those factors bear on detention.  525 F. Supp. 3d 14 at 26-27.  Those factors include whether the defendant: (1) is charged with felony offenses, or solely with misdemeanors; (2) engaged in prior planning for his criminal conduct before arriving at the

Capitol; (3) carried or used a dangerous weapon at the Capitol; (4) coordinated with other participants before, during, or after the riot; (5) assumed a formal or *de facto* leadership role with respect to the riot; and (6) injured, attempted to injure, or threatened injury to others; damaged or attempted to damage property; actively threatened or confronted law enforcement officers; or promoted or celebrated efforts to engage in such conduct.  Id.  As this Court noted:

> Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. These factors measure the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.

Id.

The defendant is charged with multiple felonies, including, but not limited to, assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) and assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).  The defendant committed multiple acts of violence towards officers on January 6, 2021.  Inside of the Capitol, the defendant persistently confronted law enforcement officers, aggressively approaching their line and refusing to exit the Rotunda despite pleas from law enforcement.  The defendant then struck an officer unprovoked, and when pushed towards the exit door by the line of officers, stuck another officer and grabbed for his weapon.

In his motion, the defendant argues that evidence of him grabbing a baton from the hands of a law enforcement officer and returning it contradicts TFO Good's claims in the affidavit.[9]

---

[9] Although the defendant's motion repeatedly characterizes TFO Good's statements in the affidavit as inaccurate, the defendant does not seem to point to anything that is inaccurate.  The defendant first takes issue with the adverb "aggressively" modifying the verb "approached."  The defendant then

To the contrary, the video is further evidence of the defendant's obstructionist behavior: a minute after failing to grab the baton of a law enforcement officer, as alleged in the Criminal Complaint affidavit, the defendant began fighting another officer.  This time, the defendant successfully removed the baton from the second officer's hands.  After the altercation, the defendant can be heard loudly commanding the other rioters to "locks arms" and proceeded to do so, in further defiance of the law enforcement officers' requests and commands.

Even after the defendant was removed from the Rotunda, the defendant did not leave the vicinity of the Capitol but traveled to the other side of the building to continue a violent assault against law enforcement officers.  Standing before the Lower West Terrance tunnel, the defendant was handed a pole.  The defendant did not discard or put down the weapon; instead, he positioned the pole over his head and aimed the weapon into the tunnel.  According to a public video provided by the government to the defendant depicting the defendant's actions, in the words of another rioter watching the defendant's conduct, "Oh, *speared* them."

---

seems to concede that the choice of adverb is TFO Good's characterization of the event and moves on to the next issue.

On page 11 of the motion, the defendant argues that the affidavit only has CCTV footage of the assault of a law enforcement officer and does not have "clear video," completely ignoring the fact that underneath the two CCTV screenshots is a screenshot from a BWC of the defendant with his hands on a law enforcement officer.  The defendant then argues that the next paragraphs do not describe violent behavior, but TFO Good's affidavit does not allege that it does.  Rather, the affidavit describes the defendant retreating and then moving forward again to scream at law enforcement officers.

TFO Good's affidavit then describes the next set of actions— as law enforcement officers began to move the defendant and others towards an exit, the defendant strikes another officer and lunges for the officer's baton.   The defendant's actions show clear inference with a law enforcement officer's performance of his duties during a civil disorder, and for his actions, the government charged the defendant with civil disorder, in violation of 18 U.S.C. § 231(a)(3).

Notably, despite having received all the CCTV and BWC videos during discovery, at no point does the defendant's motion allege that the defendant does not actually perform any of the conduct described above.  Nor does the defendant allege that the affidavit mischaracterized what each video depicts.  The defendant's motion merely superficially criticizes the photographs the government chose to accompany the statements within the affidavit.

The defendant attempts to lessen the gravity of his actions at the tunnel entrance by arguing that he did not successfully hit a law enforcement officer, that he used his less dominant hand, and that the pole only launched two feet.  The government would suggest that none of these facts are relevant.  The fact that the defendant did not successfully harm a law enforcement officer is irrelevant to the dangerousness calculation.  Nor is the fact that the pole only launched two feet before hitting another rioter and/or the shield/visor of an officer.  Regardless of whichever hand the defendant used, what is relevant is that the defendant made the decision to launch the weapon at law enforcement officers.  The fact that the defendant only had the weapon in his hands for 12 seconds is also not a mitigating fact.  It demonstrates that the defendant did not hesitate to throw the weapon.

Moreover, the defendant also acted as a cheerleader and coordinator that day, encouraging other rioters to act in defiance of the officers' requests and commands.  Prior to entering the Capitol, the defendant repeatedly shouted encouragement at others to enter the Capitol ("Let's go, we need more people") and phrases such as "Come on" and "Let's go!" Inside the Rotunda, the defendant coordinated with other rioters in locking arms and refusing to leave the Rotunda.  After throwing a weapon at law enforcement officers, the defendant remained at the Lower West Terrace and along with other rioters, began to push the officers back into the tunnel.  This coordinated action by the dozen or so protestors, heaving forward and against each other, successfully pushed the officers back for several minutes before officers managed to regain the tunnel.

In sum, the defendant's actions that day demonstrated escalating violent behavior, from committing assaults and obstructionist behavior in the Rotunda, to attempting to gravely injure enforcement officers at the Lower West Terrance tunnel.

22

### ii.     Weight of the Evidence Against the Defendant

This factor weighs in favor of detention.  The video evidence alone against the defendant includes CCTV footage of the defendant, BWC footage, videos taken from the public on January 6, 2021, as well as the videos taken from the defendant's own iCloud account.  The videos not only depict the defendant conducting the above-described actions but also provide helpful identification of the defendant.  For example, the open-source video and BWC footage depict the defendant repeatedly lifting his shirt and displaying a massive "King James" stomach tattoo written in Old English that is also visible in the defendant's prior booking photographs.  The defendant's iCloud videos depict him inside of the Capitol.  In some videos, the defendant turned the camera to face his face, confirming that he is the person holding the phone.  In addition, multiple tipsters have come forward and identified the defendant.

Other electronic evidence supports the defendant's presence at the Capitol.  For example, the defendant's phone number was identified as having connected to a cell tower that provided service to a geographic area including the inside of the Capitol on January 6, 2021.  The defendant's mother's Facebook account contained photographs of her and the defendant in Washington, D.C. on January 6, 2021, including at former President Trump's rally.  In the photographs, the defendant wore the same black/white/gray jacket and camouflage hat as he wore at the Capitol.  On May 19, 2021, the FBI executed a search warrant on the sober living facility in California that the defendant resided in and found the black/white/gray jacket that the defendant wore while inside of the Capitol.  The FBI also obtained the defendant and his mother's airline tickets, to and from Washington, D.C. in the days before and after January 6, 2021.

### iii.        History and Characteristics of the Defendant

This factor weighs in favor of detention.  As the defendant admits in motion, his criminal history is significant.  The defendant's criminal history contains convictions for drug violations, providing false information to a police officer, theft of motor vehicles, and other convictions. Although the defendant argues that he did not receive any convictions from 2016 until 2020, the defendant's motion omits the fact that he was imprisoned from February 2017 until August 2019. Upon his release, the defendant was on parole until March 13, 2021.

The defendant's prior conduct also belies his claim that there are conditions that can reasonably ensure his reappearance in court.  The defendant has had multiple periods of probation revoked and a contempt of court violation.  Moreover, the defendant committed the instant offense while he was on parole.  The defendant transitioned to probation in March 2021, and since that time, the defendant has repeatedly failed to keep his probation officer informed of his location.  According to the PSA Report in Arizona, the defendant did not receive permission to travel to Arizona in May 2021.  According to the undersigned attorney and TFO Good's conversation with the probation officer, attached hereto as Exhibit A,[10] the defendant did not receive permission to: (1) go to Washington, D.C. on January 6, 2021; (2) reside in California after his in-patient treatment ended; (3) return to California in May 2021; (4) leave the country and travel to Mexico in May 2021, and (5) be in Arizona in May 2021.[11]  The defendant's prior history does not demonstrate a person able to comply with conditions of release.

---

[10] After the final correspondence in Exhibit A, the undersigned attorney realized she made a mistake and the defendant's motion did not state he resided with his girlfriend while in the treatment facility.  The undersigned attorney immediately emailed the probation officer back to inform her of the mistake.

[11] In the District of Arizona's PSA Report, the defendant's mother reported to PSA that after finishing his inpatient treatment in California in March 2021, the defendant returned to Mississippi before

iv.        **Nature and Seriousness Posed by the Defendant's Release**

This factor weighs in favor of detention.  The defendant's prior convictions for lying to a police officer, contempt of court violation, and repeated probation violations all demonstrate that he has no respect for legal authority or law enforcement.  This conclusion is only supported by the defendant's actions on January 6, 2021.  The defendant disobeyed officers repeatedly and refused to leave the Rotunda, assaulted officers, attempted to take their batons, formed a physical line to prevent officers from performing their duties, and then launched a weapon at law enforcement officers.

While each detention determination is a fact-bound inquiry that must be made individually, United States v. Khater, 856 Fed. Appx. 322, 323 (D.C. Cir. July 26, 2021), the D.C. Circuit in Munchel notably drew a distinction between violent and non-violent participants in the Capitol riots, with the former being in a "different category of dangerousness."  991 F.3d at 1284.  In fact, the court in Munchel specifically named those who assaulted police officers as falling into the category of elevated dangerousness.  Id.  Other courts in this district have made the same observation.  See United States v. Fairlamb, No. 1:21-CR-120-RCL, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021) ("Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does.").  The defendant's actions demonstrated "a willingness to use violence—even against law enforcement—to achieve his political aims" indeed, he "sought out conflict with law enforcement by making his way to the front lines," then took actions that "were intended to injure law enforcement officers."  United States v. Fitzsimons, No. 21-cr-158, 21 WL 4355411, at *7 (D.D.C. September 24, 2021).  "Such egregious conduct reflects the depths of his disregard

---

moving to Arizona, omitting the fact that the defendant continued to live in California.

for the safety of others, for our democratic institutions, and for the rule of law." Id. (internal citations omitted).

Even after January 6, 2021, the defendant's actions are only further evidence of the danger of his release. The defendant has shown no remorse, bragging to co-workers about his presence inside of the Capitol on January 6. The defendant has repeatedly violated the terms of his state probation, first by failing to notify his probation officer of his residence in California, then by leaving Mississippi and traveling to Arizona and Mexico. Even on the day of his arrest, the defendant was in violation of probation by being in Arizona.

Not only has the defendant demonstrated that he is a danger to the community, but the defendant has repeatedly demonstrated that he cannot comply with his conditions and that there are no conditions that can reasonably ensure his reappearance in Court.

**B.      The Defendant's Plan for Release is Deficient.**

Should the Court consider the defendant's release, the government would suggest that the defendant's plan for his release is insufficient. Despite his extensive criminal history, drug history, failure to reappear, and violent behavior, the defendant's suggestion is to simply release him to a family member and let him work for the family.

There is no discussion as to ways to address the defendant's supposed health issues, the defendant's mental health, or the defendant's drug addiction. Furthermore, there are no discussions about his past noncompliance with court and probation's orders. In fact, there are no conditions at all. The defendant simply asks to be able to be released to a new community, where it is unclear if the defendant has any access to resources or even a nearby VA hospital. The motion contains no information as to this "relative" or even what kind of work the defendant would be engaged in.

The government would suggest that the defendant's three-sentence release plan does not sufficiently ensure that, based on the totality of the circumstances, the defendant would reappear or the safety of the community and any other person.

## IV.     CONCLUSION

For the reasons stated herein, the United States respectfully requests that the Court detain the defendant.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

By:     */s/ Lucy Sun*
Lucy Sun
Assistant United States Attorney
Massachusetts Bar Number 691766
United States Attorney's Office
Detailee – Federal Major Crimes
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: (617) 590-9468
Email: lucy.sun@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of this pleading to be served upon defense counsel, John Pierce, Esq., this 25th day of October 2021.

/s/   Lucy Sun
Lucy Sun
Assistant United States Attorney