**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-398-BAH** |
| **JAMES MCGREW,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James McGrew to 78 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.     INTRODUCTION

The defendant, James McGrew, a former U.S. Marine, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On January 5, 2021, McGrew flew to Washington, D.C. with bear mace to "peacefully" attend former President Trump's rally. On January 6, McGrew attended the rally, with the bear mace, before marching to the U.S. Capitol with other rioters. McGrew first joined the storming of the police line at the West Plaza, where he worked his way to the front of the crowd until he was face-to-face with officers near the foot of the inauguration stage. Undeterred by the prevalence of chemical spray, McGrew remained at the front of the line with his arm raised, and after the officers retreated from the area, he led rioters in a chant of, "Whose house? Our House!"

McGrew entered the Capitol through the unguarded Upper West Terrace doorway. Prior to entering, McGrew encouraged other rioters, repeatedly yelling, "Let's Go!" Within seconds of entering the Capitol, McGrew struck a Metropolitan Police Department ("MPD") officer with his left hand and continued up the stairs. While in the Rotunda and elsewhere, McGrew screamed at law enforcement officers and refused to follow instructions to leave the building. McGrew also struck several more officers, attempted to and successfully grabbed officers' batons, and locked arms with other rioters, in defiance of officers' commands that rioters leave the building.

After being pushed out of the Rotunda, McGrew exited the East Rotunda Doors and then traveled around the Capitol to the Lower West Terrace. There, as he had at the West Plaza, McGrew pushed his way through throngs of people until he was face-to-face with officers. McGrew initially participated in an unsuccessful push into a tunnel entrance to the Capitol Building, then taunted officers, before grabbing a wooden handrail with a metal hook on the end and launching it into the tunnel. Afterwards, in a coordinated effort with other rioters, McGrew began pushing into the tunnel again and pushing the officers within the tunnel back.

After January 6, McGrew showed no remorse for his actions. Indeed, before and even

2

after he pleaded guilty on May 13, 2022, McGrew participated in radio interviews minimizing his violent actions. On August 23, 2022, as part of the terms of his plea agreement, McGrew participated in an interview with the Federal Bureau of Investigaiton (FBI), attached hereto as Exhibit A.[2] During the interview, McGrew attempted to either justify or deny responsibility for his actions on January 6, including conduct he had admitted to during his Rule 11 hearing.

Given the seriousness of McGrew's repeated acts of violence on January 6 and the lack of remorse McGrew has demonstrated for his actions, the government recommends that the Court sentence McGrew to 78 months' incarceration, which is at the mid-range of the advisory Guidelines' range of 70 to 87 months.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, McGrew and hundreds of other rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a

---

[2] The following exhibits were previously attached to the government's <u>Opposition to the Defendant's Motion for Bond</u> [Dkt. No. 24]: Exhibit D, Exhibit G, Exhibit H, Exhibit K, Exhibit L, Exhibit M, Exhibit N, Exhibit P, Exhibit Q, Exhibit S, and Exhibit T.

mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell);

In addition, the rioters injured more than a one hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement

officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id.*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than $2.7 million.

## B.     Defendant's Role in the January 6, 2021 Attack on the Capitol

### *McGrew's Approach to the Capitol*

James McGrew participated in the January 6 attack on the U.S. Capitol. His crimes are documented through a series of videos that he recorded on his cell phone, as well as videos

provided to the FBI by concerned citizens, body worn camera (BWC) video from the MPD, open-source video, and United States Capitol Police (USCP) surveillance footage (CCTV).

McGrew flew to Washington, D.C. from California on January 5, 2021. Prior to approaching the Capitol, McGrew attended former President Trump's rally, wearing a brown hat, a black/white/gray "Columbia" jacket, blue jeans, a blue Trump flag around his neck, and a camouflage-colored baseball cap. Both pictures below are from McGrew's iCloud account. In the photograph to the left, Figure 1.1, McGrew took a selfie of himself at the rally. McGrew's mother, who wore a black hat, is in the background of the picture, above his left shoulder.



*Figures 1.1 and 1.2*

McGrew then marched with the other rioters to the Capitol. There, on the west side of the Capitol, standing before the West Plaza, McGrew took a video, attached hereto as Exhibit B. In the video, swarms of rioters had already climbed the scaffolding while others crowded around the

law enforcement officers and barricades at the West Plaza. *Id.* As the crowd chanted "Freedom,"

"Charge," and "USA," McGrew yelled, "Let's go!" as well as "Take the step!" *Id.*

 

*Video Still from Exhibit B/ Figures 2.1 and 2.2*

### *McGrew at the West Plaza*

McGrew can be seen in open-source video of the West Plaza, attached hereto as Exhibit C.

Around McGrew, hundreds of rioters breached the barricades and pushed forward towards the

Capitol, violently assaulting law enforcement officers along the way with weapons such as poles

and sticks. Ex. C. In the video, McGrew moved to the front of the melee and was one of the first

rioters to get past the police line. *Id.* As he faced the direction of the violence, McGrew raised the

pole in his hand into the air, before tossing it back into the crowd. *Id.*



*Video Still from Exhibit C/ Figure 3*

In a second open-source video, attached hereto as Exhibit D, law enforcement officers retreated from their semicircular defensive line at the foot of the inauguration stage at the West Plaza. McGrew stood near the front of the mob as the crowd surged forward, assaulting the retreating officers with fists, makeshift weapons, and various chemical sprays. Ex. D.

8



*Video Still from Exhibit D/ Figure 4*

McGrew worked his way to the front of the crowd where he was face-to-face with a handful of officers protecting the larger group of retreating law enforcement officers. *Id.* For several seconds, McGrew faced the officers with his arm raised. *Id.*



*Video Still from Exhibit D/ Figure 5*

Moments later, McGrew was impacted by a chemical agent, which caused him to fall back, take off his hat and the flag wrapped around his neck, cough and spit, and then lift his shirt to wipe his eyes, nose and mouth, as shown in the below series. *Id.*



*Video Stills from Exhibit D/ Figures 6.1-6.4*

Undeterred, McGrew then re-approached the foot of the stairs up onto the inaugural stage, where the last of the officers had retreated. *Id.* McGrew then led other rioters in a chant of, "Whose house? Our House!" *Id.*



*Video Still from Exhibit D/ Figure 7*

After the officers retreated, McGrew filmed a video with his iPhone. Ex. E. McGrew can be heard shouting, "Let's go!" as rioters around him chanted, "USA." *Id.* After climbing the stairs toward the Capitol Building, McGrew filmed another video, excitedly shouting, "Let's go!" nine more times. Ex. F.

### *McGrew's Entry into the U.S. Capitol*

After moving beyond the West Plaza, McGrew climbed stairs and approached the doors outside of the Upper West Terrace. While standing on scaffolding, McGrew filmed another video of the rioting crowd below, attached hereto as Exhibit G, as he cheered fellow rioters. McGrew screamed, "This is what freedom looks like!" "Four more years!" and shouted words of encouragement to other rioters, such as "Let's go, we need more people!" and "Come on, come on!" McGrew shouted, "Let's go!" approximately 14 more times. Ex. G. At one point, immediately before entering the Capitol, McGrew gleefully yelled, "We took this thing!" *Id.*

At 2:45 p.m., McGrew entered through the unguarded Upper West Terrace doorway, as captured on CCTV, attached hereto as Exhibit H, as well as in McGrew's iCloud account, attached hereto as Exhibit I. As the building alarms blared, another rioter shouted, "Holy shit, we're fucking in here!" Ex. I. Amidst laughter, McGrew shouted back, "This is what freedom looks like!" *Id.* Second later, McGrew and other rioters encountered an MPD Officer standing next to the stairs, who yelled at the rioters, "Get out!" *Id.* McGrew and other rioters immediately responded, "You get out" before McGrew leaned over the bannister and struck the officer with his left hand, causing her helmet and eyeglasses to be displaced. *See* Exs. H and I. Although it is unclear where McGrew struck the officer, the officer, who was alone, repositioned her helmet and eyeglasses and retreated. Ex. I.



*Video Still from Exhibit H/ Figure 8*



*Video Still from Exhibit I/ Figure 9*

McGrew then continued up the stairs while justifying his actions to other rioters, stating, "They hit us first, they hit us first, she should have never touched one of us." Ex. I. Upon entering the Rotunda, McGrew enthusiastically led a chant of, "Whose house?" *Id.*

After exiting the Rotunda, McGrew observed a large crowd of rioters near the Old Senate Chamber. *Id.* As he had at the West Plaza, McGrew made his way to the front of the crowd to aggressively confront law enforcement offcers.

### McGrew's Conduct Near the Old Senate Chamber

By 2:43 p.m., rioters had gathered near the Old Senate Chamber, attempting to shove past MPD officers blocking their path. Ex. J. At approximately 2:47 p.m., rioters began pushing against the officers again to access a staircase behind the officers. *Id.* During the struggle, an officer gripped the door frame and staircase while pushing against the rioters and used his body to block the path up the stairs. *Id.*



*Video Still from Exhibit J/ Figure 10*

At 2:48 p.m., McGrew appeared in the staircase. *Id.* As the MPD officer continued to push against the rioters, including McGrew, McGrew reached around another rioter to grab underneath the officer's helmet. *Id.*



*Video Still from Exhibit J/ Figure 11*

After the officer relented and let McGrew pass, McGrew climbed the stairs until another officer instructed him to go back down. *Id.* By 2:49:50 p.m., McGrew was before the police line near the Old Senate Chamber. Ex. K. During an exchange with police, McGrew repeatedly yelled statements such as "We're coming in here, whether you like it or not!" and "Fight with us, not against us!" *Id.* McGrew also filmed the officers on his phone, and when they refused to let him pass, McGrew shouted their badge numbers and their names. *Id.*

### McGrew's Conduct Within the Rotunda

At approximately 2:58 p.m., McGrew reentered the Rotunda. Exs. L&M. As law enforcement officers entered the Rotunda and began the process of moving rioters out of the room

14

towards the East Rotunda Doors exit, at approximately 3:05 p.m., McGrew first pushed an unknown officer and then struck an MPD officer standing before him. Ex. L.



*Video Still from Exhibit L/ Figure 12*



*Video Still from Exhibit L/ Figure 13*

After assaulting the MPD officer, McGrew retreated several feet from the police line, but

did not leave the Rotunda. *Id.* Seconds later, McGrew moved forward, re-approaching the officers while screaming about the stitches in his head from his Marine military service.[3] *Id.* When an officer calmly told McGrew, "Just leave, just leave man, come on," McGrew responded by screaming, "You leave. You leave. This is our house." *Id.*

Again, officers began attempting to move the rioters across the room to the exit closest to the East Rotunda Doors. *Id.* At approximately 3:07 p.m., when an officer used his baton to attempt to push McGrew and other rioters closer to the exit, McGrew struck the officer and lunged for the officer's baton. *Id.*



*Video Still from Exhibit L/ Figure 14*

At approximately 3:08 p.m., as another MPD officer approached McGrew, the officer

---

[3] While standing before the Old Senate Chamber and in the Rotunda, McGrew screamed that he received 246 stitches in his head due to his military service. Exs. K&L. As McGrew conceded during his FBI interview, he actually did not suffer any head injuries warranting stitches during his time as a Marine. Ex. A.

repeatedly stated to McGrew and others, "Back up, back up." Ex. N. A struggle ensued between the officer and McGrew, during which McGrew grabbed another officer's baton, stating, "Quit hitting people," to which an officer responded, "Just back up man, just back up bro, just back up that's all." *Id.* After returning the baton, McGrew began to shout "Lock arms" to other rioters and then proceeded to lock arms and stand still, in defiance of the officers' orders to exit the Capitol. *Id.*



*Video Still from Exhibit N/ Figure 15*

During that time, McGrew loudly berated the officers. At one point, McGrew said to the officers, "Y'all are with us, not against us. They want to defund the police, you know that right? They are going to take your fucking job from you and you're fucking defending them." Ex. M.[4] McGrew called the officers, "Traitors" and stated, "We ain't leaving." *Id.* McGrew also yelled, "There are way more of us than y'all, way more . . . there's 2 more million people right there

---

[4] At :50 into Exhibit M, McGrew observed a crowd of rioters pushing against law enforcement officers entering the Rotunda. He immediately yelled, "Keep pushing."

behind us, 2 million more people, who are tired of this shit." *Id.*

During his time in the Rotunda, McGrew was repeatedly pepper sprayed but refused to exit the room. In the subsequent melee in which he was forcibly removed from the room, police appeared to have again pepper sprayed him. At approximately 3:18 p.m., McGrew pushed against MPD officers as they attempted to remove him from the room. Ex. O. An officer appeared to be struggling to push McGrew out of the room as McGrew gripped the officer's coat and pushed against him. *Id.*



*Video Still from Exhibit O/ Figure 16*

After being removed from the Rotunda, McGrew appeared on CCTV video near the East Rotunda Doors. Ex P. As McGrew exited the Capitol through the doors at 3:22 p.m., he repeatedly poured water on his face, presumably to counteract the chemical spray. *Id.*

18



*Video Still from Exhibit P/ Figure 17*

McGrew then stood at the entrance, holding a pole for approximately six minutes. At 3:36 p.m., after law enforcement officers cleared the East Rotunda Doorway, McGrew walked away from the door and off-camera. *Id.*



*Video Still from Exhibit P/ Figure 18*

### *McGrew's Actions at the Lower West Terrace*

By approximately 4:07 p.m., McGrew had arrived in the front of the Lower West Terrace tunnel entrance to the Capitol Building. Ex. Q. In the 30 minutes that had passed, McGrew had traveled from the east side to the west side of the Capitol. Despite the chaos, violence, pepper spraying, and sheer number of rioters crowding the vicinity of the Lower West Terrace, McGrew managed to reach the front of the tunnel.

As McGrew reached the mouth of tunnel, rioters were attempting another push into the tunnel as an individual screamed "Break that fucking window" and "Do it for Trump." Ex. R. McGrew participated in that push. *Id.*



*Video Still from Exhibit R/ Figure 19*

Rioters near the mouth of the tunnel had stolen the shields of officers inside the tunnel and passed them back into the crowd. *Id.* Despite the number of people blocking his path, McGrew continued forward and edged closer to the tunnel. *Id.*

As he arrived at the entrance, rioters were kicking and stomping on an MPD officer and

attempting to drag the officer out of the tunnel. Ex. S.



*Video Still from Exhibit S/ Figure 20*



*Video Still from Exhibit S/ Figure 21*

McGrew was almost immediately sprayed with a chemical agent and fell to the ground. *Id.*

McGrew was on the ground for about 45 seconds before rising and retreating. Exs. Q&S.

21

At 4:13 p.m., McGrew stood near the mouth of the tunnel. *Id.* As he taunted the officers within the tunnel, repeatedly yelling "We're here all night," another rioter handed McGrew a pole with a metal hook on the end, which McGrew accepted with his left hand. *Id.* The pole was almost the same height as McGrew. *Id.* McGrew then positioned the pole over his head and launched the pole into the tunnel, notably throwing the pole end with a metal hook towards the law enforcement officers. *Id.*

The pole appeared to hit another rioter and/or the visor of an officer. *Id.* The officers within the tunnel then grabbed the pole and passed the pole back towards other officers. *Id.*



*Video Still from Exhibit S/ Figure 22*



*Video Still from Exhibit S/ Figure 23*



*Video Still from Exhibit S/ Figure 24*

Despite the prevalence of chemical agents, used by both the police and other rioters,

McGrew remained at the front of the tunnel and continued to attempt to breach the tunnel entrance

to the Capitol Building. Exs. Q&T. In a coordinated effort with other rioters, McGrew began pushing into the tunnel and pushing the officers within the tunnel back toward the entrance to the Capitol, until approximately 4:20 p.m., when MPD and USCP officers managed to push the rioters out and regain control of the tunnel. *Id.*



*Video Still from Exhibit T/ Figure 25*

### *Defendant's Statements*

McGrew has repeatedly made statements – both before and after pleading guilty – in which he minimized, denied, or lied about his violent and aggressive conduct on January 6, 2021.

For example, McGrew was interviewed on the "Sandy Rios in the Morning" program on American Family Radio on April 14, 2022, one month before he pled guilty. *See* "Interview with J6 Detainees: James McGrew, Shane Jenkins, and Robert "Bobby" Gieswein," at https://afr.net/podcasts/sandy-rios-in-the-morning/2022/april/interviews-with-j6-detainees-james-mcgrew-shane-jenkins-and-robert-bobby-gieswein/ (last visited September 18, 2022). McGrew stated that when he approached the Capitol on January 6, he heard explosions and

screams. *Id.* at 6:20 to 6:57. McGrew further stated that he saw plumes of smoke in the air and the release of tear gas. *Id.*   He stated that he felt as if he were in a "war zone type state." *Id.* In fact, McGrew claimed that he felt so alarmed that he told his mother to stay at the edge of the grass near a lamp post before even approaching the Capitol. *Id.* at 7:00 to 7:50. McGrew also made statements about his throwing of the pole in the Lower West Terrace:

> They are saying that I used a flagpole as a weapon, um, which is, I can't say much more about it other than that, but I can tell you that it's completely untrue. Um, the incident that they are talking about is literally 2 seconds of me, I will say this— it is on video and everything I've done is on video and it can be refuted that my claims are true because the video will show that, is that I tossed this flagpole, not knowing it was in the direction of officers, and there's no victim, there's no victim statement, the flagpole didn't, didn't land in a manner that would have been any type of danger to officers.

*Id.* at 8:33 to 9:45.[5]

---

[5] Consistent with these interviews, McGrew published a piece titled, "I Have Heard Many Stories of Horrors and Atrocities in Tiananmen Square. This Was America's Tiananmen Square." Ex. U, also available at https://www.thegatewaypundit.com/2022/04/heard-many-stories-horrors-atrocities-tiananmen-square-americas-tiananmen-square-jan-6-victim-police-brutality-prosecutorial-misconduct-marine-james-m/ (last visited September 22, 2022). McGrew wrote:

> I truly had no idea at the horrific acts of violence upon American Citizens, by the Metropolitan Police Department and Capitol Police, I would be met with. Approaching close to the United States Capitol the sights and sounds ever so familiar from my combat service to my Country as a United States Marine would be ever present and forever present in my mind today. The sounds of explosions one after another after another, my eyes fixated on the plumes of smoke that rose in all directions atop the United States Capitol and its hallowed grounds. These sights and sounds would become quickly evident as I entered into the panicked crowd thousands of American Citizens, Elderly, and Children begging for help as many gasped from the toxic fumes from deployed gas canisters. These canisters had been indiscriminately shot and tossed into the crowds of peaceful rally-goers, women, elderly, and children alike. Quickly and instinctively my training as a Marine would kick in as I found myself running to the front lines [to] peacefully persuade Metropolitan Police Officers and Capitol Policemen to stop injuring and inciting violence upon peaceful, patriotic, American families. The Marine Corps motto "Once a Marine Always a Marine" echoing in my mind. I watched dozens of officer's spray thousands of gallons of pepper spray into crowds filled with elderly and children, not caring or even giving second thought to who they hit. I watched

Six days later, on April 20, 2022, McGrew signed the government's Statement of Offense, Dkt. No. 68, attesting that "I agree and acknowledge by my signature that this Statement of Offense is true and accurate." Of course, that Statement lays out McGrew's multiple violent confrontations with officers, and explicitly acknowledges that McGrew launched a wooden handrail over his head into the tunnel, throwing the end with metal brackets towards the officers in the tunnel, and the handrail appeared to hit the visor/helmet of an officer. *Id.* at ¶ 19. McGrew also signed the Plea Agreement on April 20, 2022. Dkt. No. 67.

One week later, on April 27, 2022, McGrew gave an interview to a website known as "StopHate." *See* "James McGrew: J6 defendant, calls from gulag to talk about his case," at https://odysee.com/@StopHate:1/James-McGrew-calls-from-the-DC-gulag:9 (last visited on September 20, 2022).[6] In the interview, McGrew characterized his misdemeanor charges as "it's like they just threw a bunch of stuff against the wall and whatever sticks, without any evidence, just threw up against the wall and said you know what, we'll find the evidence later." *Id.* at :45 to 1:15. McGrew also claimed that he entered the U.S. Capitol "through an open door, which was opened by Capitol police officers."[7] *Id.* at 1:30 to 1:43. McGrew complained that "these charges are so just, so out there, I mean I just don't understand how they can get away with this." *Id.* at

---

them deploy gas canister and rubber bullets filled with chemical deterrents shot from weapons in an effort to not disperse crowds, but to inflict pain and carnage. These weapons were used in such a quantity that even a trained combat veteran as myself wondered at times if I might die from respiratory distress. I was hit with so much of these toxic chemicals, I can remember looking at the sky and thinking it was raining and that the rain may never stop.

[6] McGrew has been detained at the D.C. Central Detention Facility pending trial and gave his interviews from that location.

[7] At the time McGrew entered the Capitol through the Upper West Terrace doors, there were no officers at the door, as McGrew admitted in his interview to the FBI.

1:55 to 2:02. McGrew also discussed the 18 U.S.C. § 111(a) plea offered to him, stating he is working on this plea offer because "in my opinion, no one's going to get a fair jury trial in D.C." *Id.* at 4:00 to 5:00. McGrew further complained about the judges in D.C. and their statements in open court about the January 6 riots. *Id.* at 5:30 to 6:20.

Approximately two weeks later, on May 13, 2022, McGrew pled guilty before this Court, acknowledging that the recitation of facts in the Statement of Offense, Dkt. No. 68, was true and correct.

Three weeks later, on June 3, 2022, McGrew was again interviewed on the "Sandy Rios in the Morning" radio show. *See* "Update with J6 Prisoners: James McGrew and Shane Jenkins," at https://afr.net/podcasts/sandy-rios-in-the-morning/2022/june/update-with-j6-prisoners-james-mcgrew-and-shane-jenkins/ (last visited on August 4, 2022).   When asked if he was at the Lower West Terrace, McGrew provided a false version of his conduct there, claiming that he had only been trying to help people:

> I was actually looking for my mother when I ran up, ran uh, was walking around the building and heard the screams of people yelling "we can't breathe," "uh we need help," "uh we need water," "we need help getting these people outta here" and I immediately um jumped into the center of that pile, to the front, and made my way to the front of that pile, and uh you know and started trying to help people. And it's in my helping other people that they're saying I got my assault [charge].

*Id.* at 19:30-20:00.

In a subsequent hearing on August 5, 2022, McGrew told this Court that the main purpose of the Sandy Rios interview was to discuss the January 6 inmates' access to religious services.

On August 23, 2022, approximately three months after McGrew pled guilty, the FBI interviewed McGrew pursuant to a provision in his Plea Agreement. Ex. A. During the interview,

McGrew admitted to bringing bear mace from San Diego, California, to Washington, D.C. *Id.* at 5:59 to 6:47. McGrew stated that he brought the mace to former President Trump's rally but left it with security before entering the rally grounds. *Id.*

McGrew further told the FBI that he went to former President Trump's rally to support the "Stop the Steal" movement. *Id.* at 4:05 to 4:47. McGrew claimed that he then walked to the Capitol to cheer on certain Congress members during the certification process. *Id.* at 10:45 to 12:09. McGrew stated that he was only "following what the crowd was doing." *Id.* at 12:10 to 12:37. McGrew stated that he never noticed barriers that stated, "Do not go past," *id.* at 13:08 to 13:14, and (despite all evidence to the contrary) was not directly pepper sprayed but did observe pepper spray in the air before going into the Capitol, *id.* at 15:50 to 16:05. In reference to his actions at the West Plaza, McGrew admitted that he was part of a crowd "moving towards the officers" as officers retreated from their line. *Id.* at 16:20 to 17:10. McGrew claimed that after he saw the officers retreating, he did not immediately go into the U.S. Capitol but walked around for another 45 minutes before going into the building.[8] *Id.* at 17:00 to 18:18.

When asked about the video in his phone of him shouting "Let's go," McGrew claimed he was "simply repeating things that [he] was hearing." *Id.* at 17:10 to 17:28. When asked what he interpreted "Let's go" to mean, McGrew stated that he "didn't really put much thought into it." *Id.* at 17:28 to 17:51. Moments later, when asked again about seeing the officers and feeling the pepper spray, McGrew admitted that it did indicate to him that the officers were trying to stop the rioters from advancing into the Capitol. *Id.* at 23:36 to 24:03.

---

[8] McGrew's statement—that he waited 45 minutes before entering the Capitol—is not true. Exhibit B, which was taken well before the officers retreated from the West Plaza, was taken at 2:19 p.m. McGrew entered the Upper West Terrace doors at approximately 2:45 p.m.

McGrew stated that he noticed when walking into the Capitol that "the door was open" and that "a window was broken on the door," *id.* at 14:15 to 14:40, but he continued into the building because he knew it was a moment in history and he "was just kinda following the crowd," *id.* at 14:45 to 15:10. However, McGrew knew he probably should not have entered the U.S. Capitol. *Id.* at 15:15 to 15:34.

McGrew stated that upon entering the Capitol, he first encountered law enforcement after going up the stairs and entering the Rotunda. *Id.* at 24:40 to 25:36. However, when asked about his striking a female law enforcement officer prior to entering the Rotunda, McGrew first claimed that he hit the officer because the officer was acting "erratic," telling people to get out, and had a physical interaction with another male,[9] then claimed that he did not hit the officer but tried to grab his phone, before finally admitting that he did swing his arm towards her "out of frustration." *Id.* at 25:36 to 28:51. McGrew then admitted that although his actions would generally be considered an assault, January 6 was different because there were some officers "doing some very nefarious things." *Id.* at 27:51 to 28:32.

McGrew then described his interactions with law enforcement officers in the Rotunda, claiming that officers were "swinging batons," "pushing people with their shields," "spraying people," and "acting like riot police." *Id.* at 29:35 to 30:07, 32:58 to 33:20. McGrew defended his actions in the Rotunda, claiming that he was trying to create separation between him and the police, that his eyes were completely shut due to repeated chemical spray, and that he was defending himself and other rioters. *Id.* at 31:00 to 33:10. McGrew admitted that he knew he was not

---

[9] As seen in Exhibit I, there is no evidence that the officer was engaged in an altercation with another individual.

supposed to be inside of the Rotunda at this point, but that he chose to stay. *Id.* at 33:25 to 33:47. McGrew admitted that he assaulted officers; however, he "felt assaulted too though" because "they went beyond their scope of what they're supposed to be doing." *Id.* at 34:40 to 35:15. McGrew then stated that one of the officers within the Rotunda directed him to the doorway to exit the Rotunda and he exited the Rotunda. *Id.* at 38:20 to 39:57.

In reference to the Lower West Terrace, McGrew claimed that he moved towards the Lower West Terrace because he heard people saying that people at the tunnel needed water, could not breathe, and required help. *Id.* at 42:50 to 43:12. He further stated that one of his first actions when he reached the tunnel was to hand people water. *Id.* at 1:06:20 to 1:06:40. According to McGrew, as he reached the front of the tunnel, he initially could not see MPD officers, only shields, and did not know if it was people or officers holding shields inside the tunnel. *Id.* at 44:00 to 44:33. McGrew admitted that he did observe people "doing the heave-ho thing" but did not want to make an "assumption" about what they were doing. *Id.* at 44:40 to 45:05.

McGrew stated that he got up on a handrail on the side of the tunnel to "get a better view" after hearing screams about people not being able to breathe and needing help. *Id.* at 45:25 to 45:58. At that point, McGrew saw that there was "an altercation with a lot of police officers" inside of the tunnel. *Id.* at 45:58 to 46:45.[10]

McGrew saw that there was a "very physical altercation" with law enforcement officers and McGrew "decided to get in." *Id.* at 47:00 to 47:13. McGrew stated he said to the officers, "We have all day, there's a million more people behind us," because he was frustrated officers were

---

[10] McGrew said that at no point did he see Rosanne Boyland, a woman who died after losing consciousness in the tunnel area of the Lower West Terrace at around 4:28 p.m. on January 6, 2021. Ex. A at 46:40 to 47:00.

hitting and spraying people. *Id.* at 1:03:26 to 1:03:58. McGrew then threw the wooden handrail with metal brackets attached into the tunnel at the officers. *Id.* at 47:00 to 48:03. McGrew stated that he threw the pole after hearing people yelling statements directly at him such as "spear him." *Id.* at 1:04:20 to 1:05:22. In contrast to his earlier statements, McGrew then denied being able to see officers inside the tunnel and stated he could only see one officer on the perch. *Id.*

McGrew denied being part of the push into the tunnel.[11] *Id.* at 1:08:50 to 1:10:15.

McGrew justified his actions on January 6 by stating that he was just going through shattered, open doors, walking past passive officers, and mostly saw outside people "yelling at cops and cops spraying bear mace . . . and then [the police] just retreated." *Id.* at 59:00 to 1:00:20. McGrew further stated that although he briefly saw a physical altercation outside, the police were mostly passive. *Id.* at 59:55 to 1:01:10.

McGrew admitted that he never received stiches or brain surgery after serving as a Marine in Iraq, telling the FBI that his lies to MPD officers on January 6, "that's probably the, one of the most things I hate about that day, is that I said that." *Id.* at 49:00 to 50:55. McGrew stated that he suffered from a concussive disorder because of his time in Iraq but acknowledged that the Department of Veterans Affairs does not believe his traumatic brain injury is service-related. *Id.* at 49:40 to 50:12. In fact, McGrew admitted that his medical records indicate that his only injury from Iraq was a concussion. *Id.* at 50:40 to 51:00. When asked if his military service had any bearing on his actions on January 6, McGrew replied, "no, I don't know, like I said, I didn't think

---

[11] In addition to admitting to participating in this push during his Rule 11 hearing, McGrew also admitted to this fact during his interview with the Probation Office, in agreeing with the conduct described in the Statement of Offense. PSR ¶ 36. However, during the FBI interview, McGrew minimized his actions, stating that he stepped down from the railing and made his way through 2 or 3 people. Ex. A at 1:08:45 to 1:10:10. McGrew falsely stated he did not push officers at all. *Id.*

a lot about the things I was doing at the time" and that on January 6, he just wanted to be a part of history. *Id.* at 51:30 to 51:55.

When asked if he had given any interviews, McGrew told the FBI that he did a Sandy Rios interview to discuss getting religious services brought to the D.C. Central Detention Facility. *Id.* at 53:05 to 53:35. McGrew then told the FBI, in order "to be honest," that he also gave another interview to Capitol Logic, a conservative show.[12] *Id.* at 53:05 to 54:09.

## III.    THE CHARGES AND PLEA AGREEMENT

On October 29, 2021, a federal grand jury returned a superseding indictment charging McGrew with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b)(1); Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); Parading

---

[12] In addition to the interviews the government listed above, McGrew also gave the following additional interview: "@J6patriotnews Interview with James McGrew 1-29-22," at https://odysee.com/@StopHate:1/James-McGrew-PMP:b (last visited September 20, 2022). The FBI was not able to find the content of the Capitol Logic interview.

Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G); and Parading, Demonstrating, or Picketing a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On May 13, 2022, McGrew pleaded guilty to Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a), the lesser-included offense in Count Four.

## IV.    STATUTORY PENALTIES

McGrew now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a), a lesser-included offense of Count Four.

As acknowledged by the plea agreement and the Presentence Investigation Report, McGrew faces up to eight years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Probation Office calculated McGrew's criminal history category as V,[13], and has calculated that the total offense level is 21, after a three-level reduction for acceptance of responsibility:

**18 U.S.C. § 111(a)(1)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b)[14] | Official Victim | +6 |
| | Total | 24 |
| U.S.S.G. §3E1.1 | Acceptance of responsibility | -3 |
| | Total Offense Level: | **21** |

McGrew's Guidelines imprisonment range therefore is 70 to 87 months' imprisonment. PSR ¶ 152. Neither the government nor McGrew disputes this calculation.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, §

---

[13] In the plea agreement, the government incorrectly calculated that McGrew had 12 criminal history points. Plea Agreement at 3 [Dkt No. 67]. The government agrees with the Probation Office's calculation of McGrew's criminal history score as 11; however, this does not change McGrew's previously estimated criminal history category of V. PSR ¶ 70.

[14] The official victim adjustment also applies under U.S.S.G. §§ 3A1.2(a), (b), and (c).

3553(a)(6). As described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration for McGrew.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged or participated in violence; (3) whether the defendant encouraged or participated in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether

the defendant cooperated with, misled, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration.

McGrew's actions before and on January 6 can be summed up in one word: violent. Prior to January 6, McGrew was prepared for violence; he traveled across the country to attend former President Trump's rally and brought bear mace—a dangerous weapon—with him to Washington, D.C. On January 6, McGrew brought the bear mace with him to the rally. While at the U.S. Capitol, McGrew, a former Marine, ignored and disobeyed repeated instructions from officers to leave the building. In complete disregard for the safety of the officers, McGrew instigated and committed multiple acts of violence and encouraged others to do the same.

McGrew first traveled to the West Plaza, where he moved past a mob assaulting a line of police officers. At that moment, rioters had attacked officers who were standing behind barricades, attempting to prevent rioters from entering the Capitol. After rushing past the mob, McGrew turned to face the direction of the mob, members of which were beating officers with sticks, poles, and even metal barricades. McGrew raised the pole in his hand into the air, before tossing the pole back into the crowd.

By his own admission, McGrew smelled the presence of chemical spray in the air. Nevertheless, McGrew clearly was not deterred by what he observed or smelled. After throwing the pole, McGrew moved deeper into Capitol grounds, to the front of a line of rioters confronting

a retreating group of officers near the inaugural stage. McGrew aggressively approached the officers with his arms raised and although he was hit with chemical spray, which caused him to bend over, cough, and wipe his face, McGrew remained at the location until the officers retreated. During his FBI interview, unsurprisingly, McGrew admitted he knew the officers were trying to prevent the rioters from entering the Capitol. Even so, McGrew continued forward.

During his FBI interview, McGrew attempted to minimize his shouting "Let's go!" by claiming that he was mimicking other rioters. But McGrew, who yelled "Let's go!" approximately two dozen times in the three videos, was not the follower—he was the instigator. McGrew also repeatedly shouted words of encouragement to other rioters, such as "Let's go, we need more people!" and "This is what freedom looks like!"

McGrew entered the Capitol through an unguarded door. During his FBI interview, McGrew stated that he had also noticed a broken window at the door. In his own video, alarms can be heard blaring at the entry. Rather than turn around, McGrew gleefully shouted, "We took this thing!" and walked into the building. When a law enforcement officer attempted to stop him and told him to get out, McGrew did not obey her order to leave the building. He did not even ignore her and walk away. Instead, McGrew stopped climbing the stairs, reached past the banister, and struck her. In his statements to FBI, McGrew first blamed her, then denied his actions, then claimed he swung his arm at her "out of frustration," and ultimately admitted he committed an assault. Following his conduct on the staircase, McGrew's actions escalated. At each turn, when law enforcement officers ordered McGrew to leave the building, McGrew responded with increased violence.

After entering the Rotunda, McGrew filmed himself immediately exiting the room and

standing behind a large group gathering near the Old Senate Chamber. Within minutes, McGrew managed to reach the front of the crowd where the MPD officers were standing in a stairway. There, upon seeing that an officer blocked passage up a set of stairs, McGrew again chose the most violent response: he reached around another rioter to grab the officer's helmet before the officer relented and let him pass. Likewise, while in the Rotunda, McGrew refused to obey the commands of officers to leave the room and repeatedly assaulted officers clearing the room.[15]

During his FBI interview, McGrew lied to FBI and stated that one of the officers within the Rotunda directed him to the doorway to exit the Rotunda and he then exited the Rotunda. To the contrary, McGrew screamed profanities, shoved and struck officers, grabbed batons, locked arms with other rioters, and pushed against officers attempting to remove him.

McGrew further claimed during the interview that his eyes were completely shut in the Rotunda due to repeated chemical spray; even so, after leaving the building, McGrew still did not leave the vicinity of the Capitol. Instead, McGrew walked around the building and bypassed hundreds of people to climb to the front of the Lower West Terrace—one of the most violent locations on January 6— to again confront law enforcement officers.

Although McGrew claims that he approached the tunnel to give people water, contemporaneous video provides a different story. Prior to reaching the tunnel, McGrew assisted other rioters in an unsuccessful push into the tunnel. McGrew then continued forward to the tunnel, where, by his own account, he stood on a perch and saw a physical altercation inside the tunnel. McGrew launched a handrail at the officers after hearing other rioters yell directions directly at

---

[15] McGrew certainly should not be credited for those times that he did not commit additional crimes, for example, handing a baton back to an officer during his time in the Rotunda.

him, including, "spear him." Although fortunately no officer was injured as a result, it was not due to any lack of effort by McGrew.

Even then, after assaulting half a dozen officers inside the Capitol and throwing a spear into a tunnel full of officers, McGrew was not finished. McGrew participated in another push into the tunnel, which he falsely denied during his FBI interview. Nevertheless, the CCTV depicted the second push, in which McGrew was able to successfully help push back law enforcement officers for a brief period of time.

In sum, despite McGrew's military background, his conduct inciting and engaging in violence on January 6 shows an absolute disregard for the rule of law. McGrew did not hesitate to violate the law, to engage in acts of disorder and violence, and to harm others, including uniformed law enforcement officers.

Since ordered detained, McGrew has spent his time at the D.C. Central Detention Facility giving interviews denying his culpability. Even after he pleaded guilty in May, McGrew gave an interview minimizing his actions at the Lower West Tunnel and providing a false version of his conduct without admitting any wrongdoing. Even during the FBI interview, McGrew alternated between denying his actions, claiming that he was simply following others and parroting their statements, and shifting blame onto the officers. In other instances, McGrew simply lied, such as initially denying assaulting an officer, implying that he calmly exited the Rotunda, or the number of interviews he gave. In sum, McGrew has shown little to no remorse for his actions.

The seriousness of this offense, including McGrew's incitement of the mob violence, his entry into the Capitol during the initial breach, and his multiple assaults on uniformed police officers, demands a lengthy sentence of imprisonment.

### B. The History and Characteristics of the Defendant

McGrew, age 40, has at least 16 adult convictions and at least another 31 arrests, and was on parole for two prior offenses—taking possession or taking away a motor vehicle, and shoplifting—when he committed this offense.

During his interview with the Probation Office, McGrew admitted that he was raised in a "happy home" and was "always loved." PSR ¶ 107. Nevertheless, starting at age 16, McGrew began a long record of arrests and convictions related to substance abuse, violence, and contempt of court—all which weigh in favor of a lengthy period of incarceration in this case:

- In 2012, McGrew was convicted of possession of precursor chemical/drugs. PSR ¶ 64. McGrew was sentenced to 15 years' imprisonment suspended. *Id.* McGrew was arrested for probation violations in 2011, 2013, and 2016. *Id.* McGrew's parole was not discharged until March 13, 2021. *Id.*

- In 2014, McGrew was charged with shoplifting. *Id.* at ¶ 65. McGrew was sentenced to 5 years' imprisonment, with 3 years, 6 months suspended.

- In 2017, McGrew was charged with taking possession of or taking away a motor vehicle. *Id.* at ¶ 66. McGrew was sentenced to two years' imprisonment. *Id.*

- As the PSR notes, records were not available for a significant number of McGrew's arrests, *id.* at ¶ ¶ 72 to 102. These include four separate arrests for driving under the influence, seven separate arrests for contempt of court, and two arrests for assaults. *Id.*

McGrew's crimes on January 6, 2021, were not an isolated event in an otherwise law-abiding life. His history and characteristics, including his history of arrests and convictions for violence, drugs, and disregard for the law, weigh heavily in favor of a lengthy term of incarceration.

McGrew served in the Marines from 2003 to 2007. *Id.* at ¶¶ 112, 115. But this makes his conduct on January 6 all the more egregious. As a Marine, he would have taken an oath to "support

and defend the Constitution of the United States against all enemies, foreign and domestic"— an oath he broke on January 6.  McGrew's service as a Marine also makes his conduct after January 6 all the more egregious as well, because as a Marine, he would have learned the Code of Honor, to "never lie" and "to abide by an uncompromising code of integrity"—a code he ignored when he made numerous public statements in which he lied about his conduct on January 6. For these reasons, McGrew's prior service as a Marine cannot be a mitigating factor at sentencing.

McGrew told the Probation Office that he suffered a traumatic brain injury while deployed to Iraq. *Id.* ¶ 120. However, McGrew acknowledged in his FBI interview that the Department of Veterans Affairs does not believe that his traumatic brain injury is service related.[16] When the FBI explicitly asked McGrew whether his military service (i.e., his concussion) had any bearing on his actions on January 6, McGrew replied "no, I don't know, like I said, I didn't think a lot about things I was doing at that time" and that on January 6, he just wanted to be a part of history. The videos of McGrew's hours-long assault on the Capitol Building, and his interviews since January 6, 2021, make clear that his crimes were not triggered by any brain injury but instead by his zeal to violently interrupt the certification of the electoral college vote.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

---

[16] McGrew's military records are attached hereto as Exhibit V and state:

> (09-JUL-04) – LCPL MCGREW SUSTAINED A LEVEL ONE CONCUSSION AND PAIN IN HIS LEFT KNEE FROM AN EXPLOSION WHILE CONDUCTING COMBAT OPERATIONS IN THE AL ANBAR PROVINCE. LCPL MCGREW WAS TREATED AND RETURNED TO DUTY BY THE LOCAL BATTALION AID STATION. LCPL MCGREW WILL NOTIFY NOK. PURPLE HEART IS NOT RECOMMENDED. THIS IS FINAL PCR.

Ex. V at 5.

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[17] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. McGrew's criminal conduct, including ignoring the commands of law enforcement officers and assaulting them, including with a weapon, is the epitome of disrespect for the law. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

---

[17] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                      at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[18] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.

Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6, 2021] for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor

---

[18] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

43

that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, McGrew's statements during his radio interviews, even after his Rule 11 hearing, express no remorse for his actions. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). McGrew did not express remorse until his FBI interview, after he learned that the government and the Court were aware of the existence of his interviews. Even then, McGrew provided lies, excuses, and justification for his actions. *See* Ex. A at 14:45 to 15:10, 59:00 to 1:00:20 (minimized his entry into the Capitol, claimed police were "passive" and he was just following crowd); *id.* at 17:10 to 17:28 (minimized statements he yelled in his videos, claimed he was just repeating what others said); *id.* at 25:36 to 28:51 (defended himself striking the female law enforcement officer, claimed officer was acting "erratic" and had an altercation with another rioter); *id.* at 29:35 to 30:07, 33:47 to 35:15 (defended his actions in the Rotunda, accused the officers of "swinging batons," "pushing people with their shields," "spraying people," "acting like riot police" and he "felt assaulted too"); *id.* at 38:20 to 39:57 (lied about his exit from the Rotunda, claimed that an officer within the Rotunda directed him to the doorway to exit the Rotunda and he exited the Rotunda); *id.* at 1:04:00 to 1:05:00 (minimized his

actions in the Lower West Terrace, claimed others told him to throw the handrail, he "blindly threw that pole thinking it might hit the back of the building," and that he could only see one officer at the time); *id.* at 1:08:50 to 1:10:15 (denied being part of push into the tunnel). Even now, McGrew appears to falsely believe that he was the victim of wrongdoing on January 6, 2021, and not the perpetrator of it.

Second, McGrew has a Criminal History Category of V. He has repeatedly violated the law and despite multiple prison terms, and even multiple probation violations, McGrew flew to Washington, D.C. on January 6—while on parole—prepared for violence. He then repeatedly assaulted officers at the Capitol. He has not been deterred by prior sentences of incarceration.

McGrew's actions and statements demonstrate that the need for a lengthy sentence to provide specific deterrence from committing future crimes of violence.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

45

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6, 2021, are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare McGrew to other defendants convicted of violating Section 111 prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

However, this case does bear significant similarities to others in which defendants were convicted by guilty plea of assaulting police officers during the riot at the Capitol on January 6, 2021. In those other cases, this Court and other judges in this District have imposed lengthy sentences of incarceration. For example, in *United States v. Mattice and Mault,* 21-cr-657 (BAH), this Court imposed identical sentences of 44 months' incarceration, where the defendants, like McGrew, traveled to Washington, D.C. anticipating violence, engaged officers on the front lines at the West Plaza and in the Lower West Terrace Tunnel, and assaulted officers; notably, like McGrew, Mault was a veteran of the U.S. Army. Similarly, in *United States v. Wilson,* 21-cr-345 (RCL), the defendant, over the course of approximately 14 minutes, prevented officers from closing the doors of the Lower West Terrace tunnel, allowing other rioters to pry them open and attack officers. Then, Wilson punched police officers, attempted to take their shields, threw objects at them, and struck officers with a PVC pipe. The Court sentenced the defendant to 51 months' incarceration. Although Mattice, Mault, and Wilson each had a criminal history category of I, they received a sentence at the high end of the Sentencing Guidelines range for their assaultive conduct.

47

McGrew's conduct—the sheer number of assaults, over multiple locations, during a nearly two-hour span—is certainly more severe.

This Court may also wish to consider *United States v. Palmer*, 1:21-cr-328 (TSC). Palmer threw multiple objects, including a wooden plank, a fire extinguisher (twice), scaffolding, and orange traffic barrier at officers in the Lower West Terrance. Next, Palmer went to the Upper West Terrace, where he threw a pole at law enforcement officers. *Id.* at 17-18. Palmer also made a false statement about his conduct post-plea on the internet. However, Palmer turned himself into law enforcement, pled relatively early, and voluntarily met with the FBI to provide truthful information. The government recommended, and the court imposed, a sentence of 63 months' incarceration, at the bottom end of the applicable guideline range.

Finally, McGrew may be compared to Kyle Young. In *United States v. Young,* 21-cr-291-3 (ABJ), the Court imposed a sentencing of 86 months, in the middle of the guidelines, where the defendant, like McGrew, repeatedly assaulted officers. Young threw a speaker towards officers, jabbed officers with a pole, and restrained an officer while he was being tasered by another individual. Subsequent to January 6, Young attempted to turn himself in with an image from his FBI wanted photo.

Here, McGrew's conduct on January 6 was egregious. But it did not end on that day; indeed, even afterwards, McGrew repeatedly minimized and lied about his January 6 behavior. McGrew's conduct during and after January 6 should be given consideration. Accordingly, adopting the government's recommendation would not result in an unwarranted sentencing disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[19] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case did not suffer bodily injury as a result of McGrew's assaults. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that McGrew must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role McGrew played in the riot on January 6.[20] Plea Agreement at 8. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the

---

[19] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[20] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Capitol in mid-May 2021. *Id.* McGrew's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 78 months, which is a mid-range Guidelines sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW GRAVES
United States Attorney
D.C. Bar No. 481052

/s/ Lucy Sun
Lucy Sun
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
for the District of Columbia
Telephone No. (617) 748-3141
Lucy.sun@usdoj.gov

/s/ Jordan A. Konig
Jordan Konig
Supervisory Trial Attorney
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C. 20044
Telephone No. (202) 305-7917
Jordan.A.Konig@usdoj.gov