**UNITED STATES DISTRICT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | |
| **v.** ) | Case No. 21-cr-00398-BAH |
| ) | |
| **JAMES McGREW,** ) | |
| ) | |
| **Defendant** ) | |
| ) | |

**DEFENDANT JAMES MCGREW'S SENTENCING STATEMENT**

>William L. Shipley
>PO Box 745
>Kailua, Hawaii 96734
>Tel: (808) 228-1341
>Email: 808Shipleylaw@gmail.com
>Attorney for Defendant

I.  **Introduction**

Comes now Defendant James McGrew and provides to this Court a Sentencing Statement in advance of his Sentencing Hearing on October 14, 2022.

Mr. McGrew appears for sentencing before this Court having pled guilty to Count Four of the Superseding Indictment filed against him, a violation of Title 18, United States Code, Section 111(a).  Pursuant to the Plea Agreement, Mr. McGrew faces a maximum potential sentence of eight (8) years.

Mr. McGrew acknowledges the favorable nature of the disposition of this matter that was offered to him by the Government given all the attendant circumstances, and is grateful to the Court for having accepted the Plea Agreement between the parties.

II.  **Sentencing Guidelines Calculation**

The parties stipulated in the Plea Agreement to the following application of the United States Sentencing Guidelines to the facts of this case:

| | | |
|---|---|---|
| Base Offense Level | 14 | Sec. 2A2.2(a) |
|    Use of a Dangerous Weapon | +4 | Sec. 2A2.2(b)(2)(B) |
|    Official Victim | +6 | Sec. 3A1.2(b) |
| **Adjusted Offense Level** | **24** | |
|    Acceptance of Responsibility | -3 | Sec. 3E1.1(a) and (b) |
| **Total offense Level** | **21** | |

Mr. McGrew has 11 criminal history points as determined by the United States Probation Officer, based on the detailed analysis of his criminal history

set forth in the Presentence Report. As a result, Mr. McGrew is in Criminal History Category V.

Based on a Total Offense Level of 21, with a Criminal History Category of V, the advisory Guideline Range is 70-87 months.

### III.   The Offense Conduct.

The parties entered into an agreed upon "Statement of Offense" as part of the plea agreement. The Probation Officer has accurately set forth the relevant facts in the Presentence Report.

#### A.   Mr. McGrew's Actions Inside the Capitol Rotunda

CCTV video cameras capture Mr. McGrew entering the Capitol building through doors that were first opened from the inside by others who entered the building from a different location. Boxes were used to keep the doors open as people entered. Members of the USCP responded to the location to prevent more people from entering, but the situation became unmanageable and they retreated to the interior of the building. There was no violence at this entry point, nor was there any property damage.

Mr. McGrew followed the crowd into the Rotunda. Body-worn camera video from law enforcement officers place Mr. McGrew inside the Rotunda just after 3:00 pm. This is approximately 45-50 minutes after rioters first entered the building and forced the Joint Session of Congress to go into recess.

While inside the Rotunda Mr. McGrew had a few encounters with law enforcement officers. For the entirety of his time inside the Rotunda Mr. McGrew was holding his cell phone in his right hand and videotaping the

chaotic scene as best he could. He continued to do so even when he was engaged in struggling or pushing with law enforcement officers.

Doing so strongly suggests that Mr. McGrew had no intention to engage in any violent action towards law enforcement officers while he was inside the Rotunda. He wore no protective clothing or equipment. He possessed no weapons at this point in time. However, his subsequent actions and the manner in which he expressed himself while inside the Rotunda displayed an irrationality and belligerence that he greatly regrets. He refused to follow the instructions of the law enforcement officers to move back and exit the Capitol as he should have done.

During the conflagration inside the Rotunda, Mr. McGrew observed a USCP Officer strike a rioter in the back of the head after the rioter turned to walk away. Mr. McGrew observed the Officer prepare to strike a second blow to the same rioter, and Mr. McGrew extended his left arm to block/interfere with the Officer's ability to deliver that second blow. The Officer stumbled and was knocked off-balance when he was not able to follow through with his intended strike on the rioter.

While this incident included contact between Mr. McGrew and the Officer, Mr. McGrew was not intending to act in an "offensive" manner, but was interceding to prevent a second blow from being struck to the back of the head of the rioter who was walking away from the officers and in the direction of the exit. Mr. McGrew's conduct was in the defense of another, but at the same time he did interfere with and impede the Officer's efforts to remove rioters from inside the Rotunda.

A short time thereafter, BWC video shows Mr. McGrew among a line of people inside the Rotunda who were face-to-face with a line of Law Enforcement Officers possessing both shields and batons.  Mr. McGrew conducted himself in poor fashion during the time he was in that situation, belligerently yelling at the Officers who were for the most part standing calmly to prevent rioters for moving into other parts of the Capitol building.

At one point an Officer used a baton to "cross-check" Mr. McGrew across the ribs on his left side in an effort to get him to begin to move backwards towards the exit doors out of the Rotunda.  While still holding his cell phone in his right hand, Mr. McGrew did reach out and grab the middle of the Officer's baton with his left hand to prevent being struck in similar fashion a second time.  In response the Officer attempted to pull back the baton to break Mr. McGrew's grip but was unsuccessful in doing so.  In the seconds that followed the Officer twisted his hands in a rotational manner to both the left and the right – as if the was turning the steering wheel of a car -- in an effort to break Mr. McGrew's grip.  But with a greater range of motion by virtue of holding the middle of the baton with only one hand, Mr. McGrew was able to maintain his grip until the Officer lost grip of the baton himself.  Mr. McGrew was then left holding the baton alone, still gripping it in the middle with only one hand while holding his cell phone in his other hand.

Within a matter of just two or three seconds, Mr. McGrew stepped forward and handed the baton to an Officer who had been standing next to the Officer to whom the baton belonged.  "Tell him to quit hitting people, give it to him, he's right behind you."  Those were Mr. McGrew's words that were

captured on the BWC video of the incident as he handed the baton back to another Officer.

Again, while animated and belligerent, Mr. McGrew's actions reflect that he had no desire to engage in violence with the Officers inside the Rotunda.

Even after this episode, Mr. McGrew did not follow the directions of the Law Enforcement Officers to leave the Rotunda and exit the building. He remained inside until a sufficient number of Officers were able to push the rioters out of the building through a combination of their training, coordination, and equipment.

After exiting the Capitol's Rotunda Mr. McGrew made his way to a location that has been commonly referred to as the "Lower West Terrance." At that location there is a short passageway that leads to a non-public entrance to the Capitol building. Testimony in other cases has established that the confrontation between Law Enforcement Officers and rioters began at the doorway inside that passageway at 2:43 p.m. By the time Mr. McGrew arrived at the Lower West Terrace, a massive crowd had already gathered with dozens or hundreds already having made unsuccessful efforts to enter the Capitol through that passageway where they found their path blocked by dozens of Metropolitan Police Officers and United States Capitol Police Officers.

The Police had first ejected rioters out of the tunnel at approximately 3:30 p.m. Over the course of the next 90 minutes various groups of rioters attempted the battle their way through the police line inside the tunnel to reach the interior of the Capitol building.

After leaving the Capitol Rotunda, rather than leaving the Capitol as he knows he should have done, Mr. McGrew worked his way through the crowd on the Lower West Terrace until he was close to the entrance of the tunnel leading to the inside of the Capitol.  At no point did Mr. McGrew join in the fighting with the police at the opening of the tunnel.  He was in position to see what was going on, and at one point he was able to climb into an elevated position on the right side of the tunnel entrance (as you face the tunnel), holding on to an outcropping in the wall for balance.

Mr. McGrew as not in this position for very long when a long wooden railing, with metal brackets used to attach it to a wall, was passed over the top of the crowd outside the tunnel entrance.  Mr. McGrew reached to grab the railing with his left hand – his non-dominant hand – and after a pause of a less than two seconds he threw the railing with his left hand into the opening of the tunnel towards the line of Law Enforcement Officers.

Fortunately for all, the Officers in the front of the line were all protected by shields, helmets and face masks.  The pole struck a shield and ended up on top of the group of Officers, with one Officer grabbing it and tossing it towards the back where rioters could not regain possession.

Those 6-8 seconds will now cost Mr. McGrew several years of his liberty.

Mr. McGrew climbed down from the elevated position, and slowly made his way out of the crowd.  He found his mother and they departed from the Capitol grounds.

IV.   **Sentencing Factors Under Sec. 3553(a)**

Pursuant to 18 U.S.C. § 3553(a), the following factors are to be

considered in imposing a sentence on a defendant in a criminal case:

    1. The nature and circumstances of the offense and the history and characteristics of the defendant;

    2. The need for the sentence imposed:

        A. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        B. To afford adequate deterrence to criminal conduct;

        C. To protect the public from further crimes of the defendant; and

        D. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    3. The kinds of sentences available;

    4. The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.

    5. Any pertinent policy statement.

    6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    7. The need to provide restitution to any victims of the offense.

1. **Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**.

The nature and circumstances of the offense are not in dispute.

But one fact is worth bearing in mind when considering the presence of James McGrew at the United States Capitol on January 6, 2021, and his

actions while there.  Mr. McGrew was as close to being the "accidental rioter" as one might be able to imagine.

As the PSR explains, Mr. McGrew had no plans to travel to Washington DC on January 6 and had not done much of anything with respect expressing upset or unhappiness over the outcome of the 2020 presidential election.

On very little notice Mr. McGrew agreed to travel to Washington DC from California to accompany his mother who wanted to attend the rally on the Ellipse.  She had plans to go with members of her church in Biloxi, Mississippi, but her traveling companions had cancelled at the last minute.  Mr. McGrew agreed to return to Biloxi to travel with her so that she could attend the rally without having to go alone.

Mr. McGrew's personal history is quite complicated and involved as is made clear by the PSR.

James McGrew is an only child.  His father left his mother when he was an infant but remained in the small Alabama community where he was born.  His father chose to have little involvement in James McGrew's life.

But, due of the circumstances of the crime, that was little comfort for Mr. McGrew when his father was murdered.  His father was murdered by the husband of the woman he was carrying on an extra-marital affair with.  The notoriety of the crime in the community was such that it left its mark on Mr. McGrew even though his father was not particularly involved in his life.

Mr. McGrew's uncle attempted to play the role of surrogate father in the years following the murder.  But as James grew older the uncle had less and less influence over him.   Substance abuse – mainly alcohol – became a

constant in James' life as he reached the end of this teenage years.  His criminal record shows multiple encounters with law enforcement after turning 17, most of which had to do with his excessive use of alcohol.  Mr. McGrew's recollection is that he collected five drunk driving arrests before turning 21.

At that point Mr. McGrew joined the United States Marine Corps -- fully understanding that he would likely be deployed to combat in Iraq or Afghanistan.  Mr. McGrew was an MOS 0351 – Infantry Assaultman.  His job was breaching enemy fortifications and employing rockets in support of other infantryman.  He was cross-designated as an M2 .50 caliber machine gunner – MOS 0331.

While he was in the turret of an armored HUMVEE manning the mounted .50 caliber machine gun Mr. McGrew's vehicle was blown up by an IED detonation.  Although his injuries were modest enough that he was able to return to his unit, Mr. McGrew did suffer a severe concussion and "blast" injuries that have cause him persistent health issues.

After being Honorably discharged from the Marine Corps Mr. McGrew returned to Biloxi, Mississippi.  He was treated at the VA Hospital for injuries suffered during active duty, including PTSD.  This included anti-depressants and anxiety medications.

Over just a short period of time Mr. McGrew began self-medicating with illegal substances including methamphetamine and opioids.  The PSR reflects that Mr. McGrew reported continuous use of heroin from 2009 to 2021.  This is not entirely accurate – a more accurate statement is that he used opioids continually from 2009 to 2021, and among the drugs he used was heroin.

It was during this period that Mr. McGrew accumulated the three felony convictions that have earned him 9 of his 11 criminal history points. Each conviction is connected to his drug addition. 1) Possession of precursor chemicals to make methamphetamine – which he would trade to methamphetamine manufacturers for their finished product. 2) Felony shoplifting of thousands of dollars in cell phones and accessories. 3) Automobile theft. All were "crimes of opportunity" to obtain money with which to buy controlled substances to support his habit.

Mr. McGrew sacrificed a decade of his life to drug addiction, including efforts at marriage and raising children.

But after his release from Mississippi state prison on the automobile theft conviction, and a commitment to an inpatient detoxification center for a probation violation, Mr. McGrew first showed signs of possibly beginning to turn his life around.

After the 30-day detox program in Florida he relocated to northern San Diego County in Southern California for a month residential treatment program. Mr. McGrew remained sober through his entire six months and successfully completed the program. He developed a healthy personal relationship with someone he met in the program. He also decided upon a career he wanted to pursue for the first time in his life – drug addiction counseling for military veterans like himself.

He enrolled in Palomar Junior College to begin pursuing an AA degree in that field, and moved in with his then-girlfriend in a small house owned by her parents. This all took place shortly before his trip to Washington DC on

January 6. His then-girlfriend was supportive of his making the trip, and discussed possibly going with him and his mother.

A few months after his trip, the FBI made contact with his then-girlfriend and told her what Mr. McGrew had done at the Capitol on January 6. As a result of learning that information she ended their relationship and kicked him out of the house they shared. Shortly thereafter, out of depression, Mr. McGrew resumed using controlled substances. His use was ended by his arrest in this case in late May 2021.

Just prior to his arrest, Mr. McGrew was able to take his final exams for his classes at Palomar Junior College. He learned after his arrest that he received passing grades and college credit for each course. He intends to resume his studies after being released from federal custody with the same goal in mind – becoming an addition counselor for military veterans like himself who struggle with returning to civilian life.

Mr. McGrew has remained in custody from June 2021 to October 2022, a period of 16 months. He faces a long period of additional incarceration once he is sentenced in this case. Mr. McGrew is aware of the challenge in front of him – he's been in prison before. But he has a goal for when he is released for the first time in his life.

### 2. **Need for the Sentence Imposed.**

A sentence within the advisory Guideline Range will be one of the longer sentences imposed for a Sec. 111(a) assault charge with no injury connected to the events of January 6. Mr. McGrew understands that the guideline range he faces is largely influenced by his criminal history that places him in category V.

Absent any mitigating circumstances, a sentence in the middle of the range to take into account the criminal history would probably be called for.

### 3. The Kinds of Sentences Available.

Absent the application of a substantial variance, the only sentence available to the Court is a term of incarceration followed by a term of supervised release.

### 4. The kinds of sentence/sentencing range for the offense as set forth in the guidelines.

The Section 111(a) offense is noteworthy under this provision of Sec. 3553A because that offense is covered by both Guideline Section 2A2.2 and 2A2.4, with Section 2A2.4 resulting in a much lower base and adjusted offense level calculations. The differences in guideline ranges between the two guideline provisions involve sentences of many months versus sentences as high as several years such as that faced by Mr. McGrew here.

The difference between the two provisions turns on the question of physical contact and intent to injure in the charged offense. Here, while Mr. McGrew engaged in a range of contact with law enforcement officers over more than hour, only the final incident involved the kind of conduct that falls under Sec. 2A2.2. Yet even that conduct was seemingly half-hearted – a use of his non-dominant arm to throw an object towards a line of officers well protected by shields, helmets, and face guards.

### 5. Any Pertinent Policy Statement.

Defendant McGrew is not aware of any applicable policy statement.

### 6. The need to avoid unwarranted sentence disparities.

As noted above, the advisory Guideline Range of 70-87 months is likely to result in among the longest sentences on a Sec. 111(a) count.

Recently there have been sentences longer than the guideline range, but in those cases the defendants went to trial, caused injuries to law enforcement officers, and obstructed justice – all of which were factors that led the Court to impose higher sentences for those defendants.

Yet, if the Court were to sentence Mr. McGrew within the guideline range – after pleading guilty, causing no injuries, and not obstructing justice – he would suffer in disproportionate fashion as compared to those more egregious offenders who might lack a criminal history but acted in a fashion that caused much greater harm.

Taking into account the facts in mitigation – the "accidental" nature of Mr. McGrew's travel, the lack of intent to engage in violence towards law enforcement in the Capitol Rotunda, and half-hearted nature of the effort made to throw the wooden railing into the tunnel, and the disruption Mr. McGrew has caused to his own journey towards becoming a productive citizen – a sentence of 54 months, followed by a 36 month term of supervised release, would be appropriate pursuant to Sec. 3553(a).

Date: October 1, 2022                    Respectfully Submitted,

                                         /s/ William L. Shipley
                                         William L. Shipley
                                         PO Box 745
                                         Kailua, Hawaii 96734

Tel: (808) 228-1341  
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*